(Decided June 28th, 1898).

·

STATE OF MARYLAND, Ex-Relatione ROBERT H. CLARK, JR., by his Next Friend · *vs.* THE MARY-.LAND INSTITUTE FOR THE PROMOTION OF THE MECHANIC ARTS.

*Constitutional Law—Fourteenth Amendment of Constitution of U. S.—*
 *Exclusion of Colored Pupil From School Receiving Municipal*
 *Aid—Contract Between School and Municipality.*

An educational institution, which receives municipal aid but is not a part of the public school syst em, may lawfully exclude colored pupils, and such discrimination is not in conflict with the 14th Amendment of the Constitution of the U. S.

The provisions of the Fourteenth Amendment of the Federal Consti-tution, relating to the equal protection of the law and secur-ing the privileges and immunities of citizens of the U. S., have ref-erence to the action of the State exclusively and not to any action of individuals or of private corporations.

The State or a municipality may lawfully grant aid to a private educa-tional institution from which colored pupils are excluded.

The municipality of Baltimore made a contract with the Maryland In-stitute, a private school incorporated for instruction in the mechan-ical arts, by which the school agreed to give instruction to a certain number of pupils to be nominated by members of the City Council in consideration of a certain annual appropriation.   This appropri-ation was renewed by the municipality with full knowledge that

colored pupils were not received by the Institute.  The petitioner, a colored person, was appointed to a scholarship by a member of the City Council, and upon the refusal of the Institute to receive him applied for a *mandamus*.  *Held*, that the petitioner was not entitled to be received as a pupil either under the contract between the school and the city or under the privilege clause of the Fourteenth Amendment of the Federal Constitution.

Appeal from an order of the Superior Court of Baltimore City (RITCHIE, J). overruling the demurrer to the answer and dismissing the petition for a *mandamus*.

The cause was argued before MCSHERRY, C. J., BRYAN, FOWLER, BRISCOE, PAGE, BOYD and PEARCE, JJ. (Feb. 16 and 17, 1898).

*John Phelps* (with whom was *W. A. Hawkins* on the brief), for the appellant.

It is submitted on behalf of the petitioner :   1.  That the ordinance, construed with reference to the Fourteenth Amendment, gave him the same right to free education as it gave to white persons.  2.  That the respondent was legally bound by the ordinance to receive him if he was properly appointed, and no objection found against him other than his color ; that in refusing him admittance on the ground of his color the respondent was acting in violation of its legal duty under the ordinance and will be compelled to comply with it by writ of *mandamus*.

It is the ordinance which is the subject of construction since it alone determines the qualifications of appointees. The words of the ordinance are:  " There shall be appointed one pupil by each member of the First and Second Branches of the City Council, who shall be entitled to instruction for the period of four years in said schools."   By the contract the Institute agreed to receive into its said schools 33 pupils annually, "to be appointed in the manner provided in said ordinance."   There can be no doubt that the prohibition of the Fourteenth Amendment applies to an ordinance of a municipality.   *Yick Wo v. Hopkins*, 118 U. S. 356.

If the ordinance had in express terms excluded negroes from the benefits conferred, it would have been unconstitutional and void as prohibited by the Fourteenth Amendment, either: 1. If the benefit conferred is public education as part of the system maintained by the city under egislative authority. There is no education provided for lby the city similar or substantially equal to that offered by this ordinance, and the exclusion by a State agency of negroes from the education conferred thereby, or the maintenance of a system which gives the blacks inferior privileges, would be unconstitutional. For whenever a system of public schools is maintained by a State or under State authority it must be substantially equal in its benefits to both white and colored of the same class. This is admitted both by the Court below and by the appellee and supported by numerous cases. *Hall* v. *DeCuir*, 95 U. S. 504–506 ; *Claybrook* v. *Owensboro*, 16 Fed. Rep. 297 ; *United States* v. *Buntin*, 10 Fed. Rep. 730 ; *State* v. *Duffy*, 7 Nev. 342, 348 ; *State* v. *McCann*, 21 Ohio St. 198 ; *People* v. *Gaston*, 13 Abb. Pr. (N. S.) 160, 164 ; *Ward* v. *Flood*, 48 Cal. 36 ; *People* v. *Gallagher*, 93 N. Y. 438–451; *Corry* v. *Carter*, 48 Ind. 327 ; *Chase* v. *Stephenson*, 71 Ill. 383.

Or 2. Whatever may be the benefit conferred, it would be a discrimination by a State agency against the negro on the ground of color, and the Fourteenth Amendment prohibits all attempts directly or indirectly to single out the colored race as an object of discriminating laws. *Strauder* v. *West Virginia*, 100 U. S. 303 ; *Virginia* v. *Rives*, 100 U. S. 313 ; *Ex parte Virginia*, 100 U. S. 339; *Yick Wo* v. *Hopkins*, 118 U. S. 356. Hence the ordinance in question must be construed as not excluding negroes, but extending to them the same rights as to white persons of the same class without discrimination.

The Institute is wholly responsible to the city, and both are responsible to the public, for the education of these pupils. The elements of agency are here. The State is

behind them all, and is ultimately the party who is acting as principal. The prohibitions of the amendment upon States extend to all agencies and instrumentalities employed in the administration of its government, whether superior or subordinate, legislative, executive or judicial. *Ex parte Virginia*, 100 U. S. 339 ; *Virginia* v. *Rives*, 100 U. S. 313; *Neal* v. *Delaware*, 103 U. S. 370; *Ah Kow* v. *Nunan*, 5 Sawy. 552.

As to the alleged " construction of the contract by the parties," any change or construction thereof must have been made by *both* parties in order to be effective. But the city could not make any change or arrangement of any . kind looking to the exclusion of negroes. Nor conld its agents. ˙ The action of the city ministerial officers in unequally enforcing or aiding in a discriminating application of an ostensibly fair law, is unconstitutional. *Yick Wo*, 118 U. S. 356, 373 ; see *M. & C. C.* v. *Radecke*, 49 Md. 217. But no construction of the contract by the parties as to qualifications of appointees could in any manner alter the terms of the ordinance which establish what those qualifications are. The city cannot by contract bargain away its legislative discretion, nor can such contract control its legislative or governmental authority. *Gale* v. *Kalamazoo*, 23 Mich. 343. The effect contended for can only be accomplished by a repeal, altering or re-enactment of the ordinance by the Mayor and City Council, which has confessedly never been done. I *Dillon on Mun. Corp.*, section 314.

The respective rights and obligations of the petitioner and respondent are not contractual, but arise out of the ordinance, the ordinance being the instrument which fixed the rights, contingent on the assent of the respondent; the " contract " being the assent of the respondent to the terms of the ordinance and giving it effect. The ordinance is not a contract. Municipal contracts are ordinarily made by the interposition of properly authorized agents. The authorizing a contract to be made *under the ordinance* plainly

shows the intention of the Legislature that the ordinance itself should not operate as a contract.    1 *Dillon Mun. Corp.*, secs. 445, 450.    The *ordinance*, and not the contract, is embraced in the City Code as part of the city regulations concerning public schools.    *Baltimore City Code*, Art. 44, secs. 53 to 56 ; see *R. R. Co.* v. *State*, 37 Ind. 489 ; *Mobile, &c., R. Co.* v. *Wisdom*, 5 Heisk. 125.

Here the Institute not only accepted the public money, but expressly agreed to be bound by the ordinance, agreeing that everything should be done in accordance with the terms of the ordinance.    Whatever may be the technical aspect of the respondent's obligations, they are certainly not private in any sense, but are in the nature of public, political or governmental functions, *i. e.*, of public education, in compensation for public money raised by taxation for public schools.    And the appropriation would be *ultra vires* in any other aspect.    The education provided for in this ordinance is *public education.*    It cannot be private. Nothing is better established than that it would be an unwarrantable diversion of public funds to apply them to private purposes as to a private school or for private education. *St. Mary's Ind. Sch.* v. *Brown, supra; Ellesburg* v. *Seay*, 83 Ala. 614 ; *Cooley on Taxation*, 2d ed., page 122.    Could the City Councilmen pass an ordinance similar to this and appropriate $9,000 annually expressly for the education of their own sons in the respondent's schools ?

*Even this contract* cannot be supported as an application of public funds, unless there is some *public benefit* derived from it, giving the public an interest in its performance. *M. & C. C.* v. *Clunet*, 23 Md. 468 ; *St. Mary's Ind. Sch.* v. *Brown*, 45 Md. 335 ; *Cushing* v. *Inhabitants*, 10 Metcalf, 508, 520 ; *Allen* v. *Jay*, 60 Maine, 124 ; *Opinion of Court*, 58 Maine, 597 ; *Cooley Const. Lim.*, 207 ; *Cooley on Taxation*, 2d ed., pp. 113, 122, etc.; *Morawetz Private Corp.*, sec. 1114, *ut supra.*    The *public education* provided is the only possible public benefit to be derived.    It is made the express consideration for the payment.    No incidental

or consequential advantages to the public will support the payment. *Curtis* v. *Whipple*, 24 Wis. 350–354.

*Mandamus* lies to compel a corporation or an individual to perform a public duty, or one imposed by law ; and the duty of the respondent to admit the petitioner in this case is a public duty and imposed by law. It is unnecessary here to discuss whether the respondent is a public or a private corporation, or even whether it is a municipal agency. *Mandamus* lies against schools wholly outside the ordinary public school system and governed by their own trustees, to compel the admission of one entitled by law to be admitted. *State* v. *White*, 82 Ind. 278 ; *Foltz* v. *Hoge*, 54 Cal. 28 ; *Nourse* v. *Merriam*, 8 Cush. 11. And against persons or corporations generally to enforce the performance of a legal or public duty. *Merrill on Mandamus*, sections 25, 26, 27, 157, etc.; *High Legal Rem.*, sec. 277 ; *Spelling Extr. Legal Rem.*, sec. 1591.

*John M. Carter* and *Edgar H. Gans*, for the appellee.

The right to be enforced by *mandamus* must be a legal right ; it must be clear, definite and certain, and the circumstances must be such, that the Court can actually accomplish something by the writ. The question now arises, where does this particular petitioner get the *clear, definite, egal right to be received as a pupil into this particular school ?* Unless he can show this positive right, he has no case for a *mandamus*. There are so many aspects under which these cases of racial discrimination arise, that it will tend to clarify the case and confine it within its own proper limits if we consider first of all, the circumstances upon which this alleged right is not and cannot be founded.

A. *Not founded upon privilege clause of Fourteenth Amendment.* The Fourteenth Amendment of the Constitution of the United States provides that, "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." Ever since the passage of this amendment, strenuous efforts have been

made to show that under and by virtue of it *new rights* were conferred upon the citizen.    It has, however, been uniformly held that this clause only has application to rights of citizens of the United States as such, and adds nothing to the rights of one citizen against another.    As to privileges and im-munities belonging to citizens of a State, these must rest for their security and protection where they have always rested, that is, with the State in which the citizen resides.    *Short* v. *State of Md.*, 80 Md. 401; *Civil Rights cases*, 109 U. S. 3 ; *U. S.* v. *Cruikshank*, 92 U. S. 543 ; *U. S.* v. *Harris*, 106 U. S. 629 ; *Virginia* v. *Reeves*, 100 U. S. 313 ; *Slaughter House cases*, 16 Wall. 74.    This construction of the Fourteenth Amendment has been uniformly applied to educational rights and ̇advantages.    The right of children to attend State schools and  of parents to send them there, wherever such right exists, is not a  privilege or immunity belonging  to a citizen of the United States as such.    It is a right  created by the State, and belonging to the State as such.    The clause in the Constitution providing that no State shall abridge the privileges and immunities of citizens of the United States has no application.    *Lehew* v. *Brummell*, 103 Mo. 546; 11 L. R. A. 829; *People* v. *Gallagher*, 93 N. Y. 447 ; *Corey* v. *Carter*, 48 Ind. 355 ; *State* v. *McCann*, 21 Ohio St. 198 ; *Ward* v. *Flood*, 48 Cal. 36 ̇; 50–1; *Hall* v. *De Cuir*, 95 U. S. 504–5 ; *Racial Discrimination*, 30 Am. Law Reg. 86–8.

    B. *Right not founded on any local civil rights legislation.* There are many cases among the authorities where colored persons have been allowed certain rights by virtue of State legislation, somewhat similar to the Act of Congress, known as the Civil Rights Bill, which was declared unconstitutional in the *Civil Rights cases*, 109 U. S. 3.    Thus in certain States Acts have been passed punishing those who refuse colored persons equal advantages in conveyances, hotels, theatres, · barber shops, places of amusement, &c.    Of this class of cases the following are examples, *all founded upon the local statute : Joseph* v. *Bidwell*, 28 La. Ann. 382 ; *U. S.* v. *New-*

*commer,* 11 Phila. 519 ; *Bowlin* v. *Lyon,* 67 Iowa, 539 ; *People* v. *King,* 110 N. Y. 418 ; *Messenger* v. *State,* 41 N. W. Rep. 638 (Neb.) ; *Baylies* v. *Curry,* 30 Ill. App. 109 ; *Ferguson* v. *Giles,* 82 Mich. 364. We mention these cases simply for the purpose of distinguishing them from the case at bar, and so that the Court may understand that if quoted by the petitioner, they are not authorities for this case, as we have in Maryland no local civil rights statute.

C. *Right not founded upon the general public school law.* Most of the cases of racial discrimination arise from the attempt to exclude colored persons from the public schools ; or, to prevent the mixing of the races in one public school. As we have seen, the right of children to attend the public schools is a right created by the State. When the State establishes a public school system by law, every child conforming to the regulations prescribed by the system has a right to attend. This right is founded upon the law of the State, and if he is denied admission, he can show a clear legal right, based upon the State law, which is therefore enforceable by *mandamus.* In establishing a *public school system* the State has no right to exclude colored persons from its benefits. This is inhibited by the other clause of the Fourteenth Amendment, to-wit : " No State shall deny to any person within its jurisdiction the equal protection of the law." Under this section it is not necessary that the races shall be educated together in one school. Mixed schools are not required by the Constitution. It has been quite uniformly held that colored persons may be excluded from white public schools whenever other public schools with equal advantages are provided for colored persons. Of this class of cases, the following are examples, all founded upon *general laws creating public schools: Lehew* v. *Brummell,* 103 Mo. 546 ; *People* v. *Gallagher,* 93 N. Y. 447 ; *Corey* v. *Carter,* 48 Ind. 355 ; *State* v. *McCann,* 21 Ohio St. 198 ; *Ward* v. *Flood,* 48 Cal. 36 ; *U. S.* v. *Buntin,* 10 Fed. Rep. 736.

These authorities have no application to the case at bar,

for in this case the petitioner does not and cannot found his
right to enter the Maryland Institute on any State law ; the
Institute is not a *public school,* not a part *of the public school*
system, and not a *public corporation,* as will be more fully
shown hereafter.    If the petitioner was founding his right
on a general State law, then in the very nature of things, he
would not have the exclusive right to enter the Institute,
for the right would necessarily be open to all other colored
boys of like qualifications.    He contends that he has the
right to enter to the exclusion of other colored boys, and
consequently must rely, if he has any right at all, not on a
general State law, but on special circumstances peculiar to
his individual case.

D. *Right not a common law right.*    Some of the many
cases decided upon this question of race depend upon cer-
tain common law rights.    Thus every one has the common
law right to be conveyed by a common carrier, or to be
lodged by an innkeeper.    If a colored person is denied the
right of carriage or lodging simply on account of his color,
he may maintain an action for this denial of his rights, and
if a State Court would not protect him in this action, then
the State, through its judicial department, would be deny-
ing to one of its citizens, the equal protection of the laws.
Evidently the petitioner has no common law right to be
educated at the Maryland Institute.

Whatever opinion may exist with reference to the con-
struction of the contract of 1893, there can be no possible
doubt as to what the parties to the contract meant in 1897.
There can be no possible doubt but that the appropriation
of 1897 was made in consideration of the Institute agreeing
to receive *33 white* pupils for that year.    The petitioner
may argue that the contract was illegal, but he cannot pos-
sibly argue, on the facts, that the Institute agreed in 1897
*to take white and colored pupils* in consideration of the ap-
propriation of 1897, when they expressly decline, before the
appropriations of 1896 and 1897 are passed, to take col-

ored pupils, to the full knowledge of the councils which passed these appropriations.

The Maryland Institute is not a part of the municipal government by virtue of this contract; its management is under the control of its own officers; their duties are not prescribed by law; its teachers are not appointed by the city or under its contract; it is not subject to any of the ordinances relating to the public schools; when the Institute acts, it does not act in the name of the State or city; it exercises no part, even the smallest, of the sovereign power of the State; its acts are not the acts of the city, and its voice is not the city's voice. "The relation between it and the city is simply that of a contracting party, and the contract is just such a one as the Institute might make with any citizen who wished to have instructed thirty-three pupils to be designated in a given manner. The fact that the contract was made with the city instead of with an individual cannot change the corporate status of the respondent, or make this any other than a private contract. It creates no possible official, governmental or political relation between the city and the Institute, without which the respondent cannot be considered a municipal or State agency." *Opinion of Ritchie, J.*

The meaning of the expression in 45 Md. 336, "*pro hac vice* municipal agencies," is that contractors are doing under contract what the city could do through its own municipal agents. The Institute is no more a municipal agent under this contract than a contractor to build a bridge for the city would be. The act of discrimination being therefore the act of a private corporation, and not the act of the State or city, the Fourteenth Amendment has no application to the case.

Nor is the giving of the money to the corporation under such a contract illegal. If the giving of this money under such a contract, by the city, would be contrary to the Constitution, then also would the appropriations constantly made by the Legislature, be contrary to the Constitution,

for the same reason.   The Legislature has been appropriating money from time immemorial to institutions which are doing work for the public good, though most of them are for white persons only.   Take the Act of 1896, chapter 456, as an illustration.   In it are found appropriations to Knapp's English and German Institute, the Hebrew Hospital and Asylum Association, the General German Aged People's Home, the Western Maryland College, St. John's College and many others, in which white persons are exclusively received.   Are all these to be held void, simply because there are no colored institutions, doing precisely the same work, to which appropriations can also be made?

Is the hand of the State to be stayed until for every white institution, a similar colored institution is created?   We submit that the whole argument of the petitioner proceeds upon this misconception.   The State may not *create* public institutions for white people, and deny colored persons similar advantages, but outside of any general system of public institutions created by the State, there is no constitutional provision prohibiting the Legislature from aiding private enterprises doing beneficial public work, or which prohibits the city from having such work done under contract by existing institutions.   *Chrisman* v. *Brookharn*, 70 Miss. 481.

Even if our whole preceding contention is wrong, the petitioner would have no remedy as he is not a party to the contract.   There are cases where the person for whose benefit a contract is made may sue on it, though not a party to it, but these cases are exceptions, and are chiefly where assets are placed in the hands of one for the benefit of a third party, from which an implied *assumpsit* arises, or when the contract is solely for the benefit of the party suing.   *Nat. Bank* v. *Grand Lodge*, 98 U. S. 124;   *Cragin* v. *Lovell*, 109 U. S. 194;   *Keller* v. *Ashford*, 133 U. S. 621;   *Jefferson* v. *Ash*, 25 L. R. A. 257; 8 *Harvard Law Rev.* 93.   But in this case the contract was made with the city; the city retained entire control over it; under its provisions city officers were to inspect the work from time to time, and de-

termine whether the contract was being carried out. It is not one of those contracts upon which a third party not in privity may bring suit. The right of the petitioner, if he has any, being a right under a contract with a private corporation, cannot be enforced by the action of *mandamus*. *High*, sec. 25 ; *Rosenfeld* v. *Einsten*, 46 N. J. L. 481.

BRYAN, J., delivered the opinion of the Court.

This was a petition for the writ of *mandamus*. The Maryland Institute for the promotion of the mechanic arts is a body politic and corporate created by Acts of Assembly of Maryland. It was originally incorporated by the Act of 1849, chapter 114 ; and its charter was renewed by the Act of 1878, chapter 313. The object of the incorporation was the encouragement and promotion of manufactures and the mechanic and useful arts by the establishment of schools of art and design, and by other means adapted to that purpose. Robert H. Clark, Junior, a youth of African descent, claims the right to be admitted to these schools as a pupil ; and by his father and next friend, he files a petition for a *mandamus* requiring the above-named corporation to admit him. The grounds of his demand are set forth in his petition. The Maryland Institute (as the corporation is popularly called) filed its answer ; and on demurrer to the answer, the petition was dismissed and appeal was taken to this Court.

There can be no contest about the facts in this case ; because in addition to those admitted by the demurrer to the answer, there is an agreement of counsel admitting such other facts as it was desired to lay before the Court. We proceed to consider the circumstances which, in our opinion, are important in the decision of the questions in the case. The municipality of Baltimore by an ordinance passed in March, 1893, authorized the Mayor, Comptroller and Register to contract with the Maryland Institute for the instruction of a number of pupils in its Schools of Art and Design for the period of eight years from the first day of September next ensuing. By the second section of the

ordinance it was enacted that before the first day of September in every year each member of the City Council should appoint one pupil who should be entitled to instruction for the period of four years in the Schools of Art and Design, and that in case of a vacancy occurring from any cause among the pupils the president of the Institute should forthwith give notice to the member of the Council representing the ward to which the pupil was credited, and that he should thereupon appoint another pupil to fill the vacancy. The third section of the ordinance required the president of the Institute to report annually in the month of September to the Mayor and City Council the names of the pupils appointed and in attendance at its schools, together with a list of the vacancies, if there should be any. It also enacted that if no appointments should be made before the first day of October by the members of the City Council entitled to fill such vacancies, then the Mayor should appoint pupils to fill them. The fourth section of the ordinance enacted that the Mayor and City Comptroller and City Register should annually, or as much oftener as they might deem it expedient, inspect the said schools of the Institute, and "the condition and manner" in which it was fulfilling its contract with the municipality, and that thereupon the City Comptroller, if he was satisfied that the Institute was faithfully complying with the contract, should pay to its president annually in the month of September nine thousand dollars for the education of the pupils. The Maryland Institute on the tenth day of March, 1893, entered into a written contract with the Mayor, City Comptroller and City Register for the reception of thirty-three pupils into its Schools of Art and Design for each of the eight successive years beginning on the first day of September, 1893, and following thereafter. It appears that a youth of African descent was received into the Institute as a pupil in 1891; another in 1892, and two others in 1895. So far as we are informed by the record, no other pupils of this description have ever been admitted into the schools of the

Institute.    The effect of the admission of these four pupils was very disastrous.    There was an immovable and deep-settled objection on the part of the white pupils to an association of this kind.    Notwithstanding earnest and zealous efforts on the part of the board of managers and the faculty of teachers to reconcile the white pupils, their parents and guardians to the innovation, it caused a great decrease in the number of pupils ; and the bringing of this suit made it still greater.    On the eleventh of November, 1895, the board of managers approved this resolution :

" BALTIMORE, November 11th, 1895.

" The following action of the Committee on Schools of Art and Design was reported by its chairman, Mr. John M. Carter, and on motion, it was unanimously adopted :

" *Whereas*, The popular sentiment of all the citizens of Maryland is opposed to mixed schools ; and

" *Whereas*, The appointment of colored pupils to this school, it is believed, has caused a large decrease in the number of white pupils attending the Institute, thus lessening its power for good to the community.

" *Resolved*, That hereafter only reputable white pupils will be admitted to the schools.

" *Resolved*, That the actuary be directed to issue a circular to the members of the newly-elected City Council and other appointing powers, informing them of this action."

The actuary of the Maryland Institute prepared a circular signed by its president and the chairman of the Committee on Schools of Art and Design, setting forth the action of the board and of the committee, and attached to it a blank letter of appointment of pupils for the following year (1896).    This blank letter was in the following form :

BALTIMORE, ———, 189–.

To the Board of Managers of the Maryland Institute for the Promotion of the Mechanic Arts :

I hereby appoint, subject to the rules of the Institute, ——— (residence ———), to the scholarship in your Schools

of Art and Design, under the contract between the Mayor
and City Council of Baltimore and the Maryland Institute.

Member ———— Branch of the
City Council ———— Ward ————.

A copy of this circular and of the blank letter of ap-
pointment was sent to each member of the City Council,
and to the school boards of the city of Baltimore and the
counties.   In February, 1896, J. Marcus Cargill, a member
of the City Council from the Eleventh Ward, appointed
Clark, Junior (the appellant), to a scholarship in the Insti-
tute, writing the appointment on the printed blank, which
had been sent to him with the circular just mentioned. The
board refused to admit Clark as a pupil and requested Car-
gill to appoint a reputable white person ; the refusal was of
course because of his color.   Cargill made no other ap-
pointment, and the Maryland Institute certified to the
Mayor of Baltimore that a vacancy existed among the pu-
pils from the Eleventh Ward, and he in October, 1896, ap-
pointed a white pupil who has ever since been a member of
the school.   In February, 1897, the Mayor, Comptroller
and Register made an inspection of the Maryland Institute,
and made a very favorable report as to its condition and
the manner in which it was fulfilling its contract in regard
to the instruction of pupils sent there by the authority of
the city.   With full knowledge of the refusal of the Insti-
tute to admit any pupils except those who were white, the
City Council in 1896 and 1897 directed the annual appro-
priation to be paid to the Institute according to the contract.
And on the twentieth day of September, 1897, the City
Solicitor, in reply to an inquiry from the chairman of the
Committee on Ways and Means of the City Council, gave
his official opinion in writing that the Institute had not vio-
lated its contract by its refusal to admit a colored youth as
a pupil in its schools.   In September, 1897, Cargill ap-
pointed Clark to the scholarship for that year, which he
was entitled to fill by virtue of his position as a member of

the City Council ; and the Institute again refused to admit Clark as a pupil.

The Maryland Institute is essentially a private corporation. It was not created for political purposes, nor endowed with political powers. It is not an instrument of the government for the administration of public duties. It has none of the faculties, functions or features of a public corporation as they are designated in the *Regents' case*, 9 Gill & Johnson, 365, and the many other cases which have followed that celebrated decision. The Act of 1878, which renewed its charter, granted it the annual sum of three thousand dollars, but this grant did not make it an instrumentality of government, nor make any change in its corporate character. The *Regents' case*, 9 Gill & Johnson, 398, shows that it could not have such an effect. The Maryland Institute holds its property in its own right, and has the power to manage its concerns according to its own discretion within the limitations of its charter. It is, of course, bound faithfully and diligently to pursue the objects and . purposes of its incorporation ; but it necessarily must have the choice of means which it may judge most appropriate to its ends. It was established for the benefit of white pupils, and has never admitted any other kind with the exception of the four instances already mentioned. When it found that the admission of these pupils had a very injurious effect on its interests, and seriously diminished its usefulness, it certainly had the right to refuse to continue such a disastrous departure from the scheme of administration on which it was organized. It would have been mere folly to persevere in the experiment under the existing circumstances. We suppose that it could hardly be maintained that the constituted authorities of the corporation did not have the right to conduct its affairs according to the plan and policy on which it was founded. We see no evidence of an intention to abandon this right when the contract was made with the municipality of. Baltimore. It certainly does not appear on the face of the contract itself.

And there is nothing in the surrounding circumstances from which it can be inferred that either of the contracting parties contemplated or desired such an abandonment. The city of Baltimore has shown in the most distinct manner that it knew that the Institute had the right to refuse colored pupils, and that this right was not impaired by the contract. The Mayor, City Comptroller and City Register, the officers appointed by the ordinance to inspect the schools of the Institute and ascertain the manner in which it was fulfilling the contract with the city, having full knowledge that colored pupils were denied admission, made a most favorable report on the subject to the First Branch of the City Council. And the City Solicitor gave his official opinion to the Committee of Ways and Means that the Maryland Institute did not violate the contract by refusing to receive a colored youth because of his color. And, finally, after the resolution had been adopted that none but white pupils would be received, and after this appellant had been rejected on account of his color, the City Council well knowing these facts continued to make the annual appropriation of nine thousand dollars according to the terms of the contract. So it is evident that both the contracting parties meant the same thing when they made this contract, and that they have dealt with each other according to their mutual understanding of this meaning. We suppose that it would be a difficult matter to show that a person not a party to a contract has the right to intervene and establish a meaning contrary to the intention of the contracting parties, and upon this substituted meaning acquire and enforce rights in a Court of Justice. But unless this can be done the appellant has no cause of action, of any description, under this contract.

It has been urged that the appellant has been deprived of his rights under the Fourteenth Amendment of the Constitution of the United States. The portion of the amendment which is supposed to sustain this position is in these words: " No State shall make or enforce any law which

shall abridge the privileges or immunities of citizens of the United States ; nor shall any State deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." The gravamen of the offence of the Maryland Institute is that it has exerted the ordinary right of the proprietor of a private school to admit only such pupils as are considered desirable. It has been said by the Supreme Court of the United States that the right to follow any of the common occupations of life is inalienable. *Allgeyer* v. *Louisiana*, 165 U. S. Repts. 589. And in the same case the Court evidently shows that it regards the prevention of a citizen from doing what is proper, necessary and essential to the successful management of his business is a deprivation of his liberty, which cannot be done without due process of law. This is one of the wrongs which the Fourteenth Amendment was intended to prohibit. It would be a curiosity in jurisprudence, if the exercise in the ordinary and accustomed way of rights which the Fourteenth Amendment is so solicitous to protect should be obnoxious to its condemnation. No one can plausibly maintain that the Maryland Institute has done any wrong to the appellant by simply attending to its own business in a quiet and unobtrusive manner. It has not deprived him of any privilege or immunity which he possessed ; it has robbed him of no property ; it has not excluded him from the benefit of any legal enactment made in his favor. It has merely let him alone. It would be difficult to prove that it had in this way acted in violation of the Fourteenth Amendment. We find, in fact, that the authorities all hold that the Fourteenth Amendment refers, as its terms import, exclusively to State action, and not to anything which might be done by private individuals. In *Virginia* v. *Rives*, 100 United States Reports, 100, the Supreme Court said : " The provisions of the Fourteenth Amendment of the Constitution we have quoted all have reference to State action exclusively, and not to any action of private individuals.

It is the State which is prohibited from denying to any person within its jurisdiction the equal protection of the laws, and consequently the statutes partially enumerating what civil rights colored men shall enjoy equally with white persons, founded as they are upon the amendment, are intended for protection against State infringement of those rights." And in *Ex parte Virginia*, page 346, of the same volume, the Court speaking of the same provisions said : " They have reference to actions of the political body, denominated a State, by whatever instruments or in whatever modes that action may be taken.   A State acts by its legislative, its executive, or its judicial authorities.   It can act in no other way.   The constitutional provision, therefore, must mean that no agency of the State, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws." And this is the settled doctrine on this question.

It is contended in behalf of the appellant that the ordinance is to be regarded as the act of an agency established by the State, and that it is therefore subject to the Fourteenth Amendment.   And that the exclusion of colored pupils consequently makes it invalid.   No other objection to the ordinance is stated ; and therefore we will confine our attention to this point, without expressing an opinion on any other question in this regard.   It must be obvious, however, if the ordinance is unconstitutional, that the appellant can have no rights under it, and that his prayer for *mandamus* must be denied.   For the purpose of viewing the question in every aspect, we will *ex gratia argumenti* consider the ordinance as the Act of the State of Maryland.   The Constitution of this State requires the General Assembly to establish and maintain a thorough and efficient system of free public schools.   This means that the schools must be open to all without expense.   The right is given to the whole body of the people.   It is justly held by the authorities that " to single out a certain portion of the people by the arbitrary standard of color, and say that these

shall not have rights which are possessed by others, denies them the equal protection of the laws." *Cooley on Torts*, page 287, where a large number of cases are cited.    Such a course would be manifestly in violation of the Fourteenth Amendment, because it would deprive a class of persons of a right, which the Constitution of the State had declared that they should possess.    Excellent public schools have been provided for the education of colored pupils in the city of Baltimore.    But the Maryland Institute is not a part of the public school system.    This has been solemnly adjudged by this Court.    *St. Mary's School* v. *Brown*, 45 Maryland, 310.    The appellant has no natural, statutory or constitutional right to be received there as a pupil, either gratuitously or for compensation.    He has the same rights, which he has in respect to any other private institution ; and none other or greater.    Suppose that the State should form the same high opinion of the Maryland Institute which all men entertain, would it not be a competent and reasonable exercise of its discretion to determine that the public good would be promoted by extending its benefits to young persons who would not otherwise be able to obtain them ? And could it not make an appropriation for paying the expense of the instruction of a certain number of pupils, and appoint a mode of selecting them ?    It has been the practice for a long series of years to make provisions of this kind in the case of other institutions, and the validity of these appropriations is not questioned.    Of course the pupils selected must be eligible under the rules of the institutions into which they seek admission.    The selection of certain individuals is no injury to others who would not be eligible.    These last mentioned would not be admitted into the institutions under any circumstances, and therefore are not concerned in the question of selection.    Enlightened legislation is not enacted on the narrow-minded principle that a benefit conferred on one object is necessarily something unjustly withheld from another.    Let us suppose for the sake of illustration that there was a school of great merit

conducted exclusively for the instruction of colored pupils in branches of learning not taught in the public schools, and that the Legislature saw fit to appropriate money for the tuition of a number of colored pupils.   It is not probable that such action would be assailed as forbidden by the Fourteenth Amendment, because of an unjust discrimination against the whites.   But it cannot be doubted that the Legislature has ample power to make appropriations to special objects, whenever in its judgment the public good would be thereby promoted.   It has constantly exercised this power from the beginning of the State Government. The Legislature may make donations without regard to class, creed, color or previous condition of servitude.   The only condition limiting this exercise of this power is that it must in some way promote the public interest.   The State has never surrendered this power to the General Government ; and never can surrender it without stripping itself of the means of providing for the good order, happiness and general welfare of society.   The benefits conferred in this way are matters of grace and favor which the State bestows on its own citizens for worthy public reasons. They certainly cannot properly be described, in the language of the Fourteenth Amendment, as " privileges or immunities of citizens of the United States."   If they were such, they could be demanded by any citizen of the United States, whether resident in Maryland or Oregon.   And in that event, and only in that event, they would be comprehended within the scope of the Fourteenth Amendment. *Slaughter House cases*, 16 Wallace.   It is needless to say that the Legislature is not limited by the State Constitution in the particular mentioned.   The forty-third Article of the Declaration of Rights seems to have been intended to impress upon it the necessity of exercising for the public good the vast powers which it possesses.   It is in these words : " That the Legislature ought to encourage the diffusion of knowledge and virtue, the extension of a judicious system of general education, the promotion of literature, the arts,

sciences, agriculture, commerce and manufactures, and the general amelioration of the condition of the people."

In every view which we have been able to take of the questions presented by this appeal, we think that the judgment of the Court below ought to be affirmed.

*Judgment affirmed.*

(Decided June 28th, 1898).