NORRIS v. MAYOR AND CITY COUNCIL
OF BALTIMORE et al.
Civil Action No. 3484.

District Court, D. Maryland.
June 18, 1948.

Charles H. Houston, of Washington, D.C., and Fred E. Weisgal, Harry O. Levin, and W. A. C. Hughes, Jr., all of Baltimore, Md., for plaintiff.

R. E. Lee Marshall, of Baltimore, Md., for defendant Maryland Institute.

Allan A. Davis, Asst. City Sol., of Baltimore, Md., for Mayor and City Council.

CHESNUT, District Judge.

The plaintiff in this case, Leon A. Norris, a young negro resident of Baltimore City and citizen of the State of Maryland, made application on September 11, 1946, to the Maryland Institute for the Promotion of the Mechanic Arts, a Maryland corporation, for admission as a student for instruction in art and teacher training in art. The Institute declined his application on the ground that for fifty years past it had maintained a consistent policy and practice of admitting only white persons as students. Thereafter the plaintiff filed this suit alleging that he had been denied a right solely on the ground of race and color contrary to the constitutional protection of the 14th Amendment of the Federal Constitution which provides, among other things, that "no State shall * * * deny to any person within its jurisdiction the equal protection of the laws". The complaint prays for the following relief:

(a) A declaratory judgment that the plaintiff is entitled to be received as a student at the Maryland Institute on the same terms as other citizens and residents of Baltimore City without regard to race or color;

(b) that the Institute be enjoined from excluding him from such instruction solely because of race or color;

(c) in the alternative, if the plaintiff is not entitled to the above relief, then that the *other defendant,* the Mayor and City Council of Baltimore, a municipal corporation, be enjoined from appropriating any public money or allocating any public property or resources to the Art Institute if

it is a private corporation not under the restraints of the Federal Constitution;

(d) for damages in the amount of $20,000.

In due course the defendants have answered denying that the plaintiff is entitled to any of the relief asked against either of the defendants; extended testimony has been taken particularly with regard to the history, management and activities of the Maryland Institute, and the case has been orally argued and briefs submitted by counsel for the respective parties. It will be noted at the outset that the jurisdiction of the court with respect to the declaratory judgment prayed for raises a question of federal constitutional law as to which this court clearly has jurisdiction; but the relief by way of injunction asked in the alternative against Baltimore City is in nature essentially a taxpayer's suit of which this court would have no jurisdiction in the absence of allegation or proof that the amount in controversy exceeds $3,000, which does not exist. From the evidence in the case I find the following facts.

### History of the Maryland Institute

The Maryland Institute was incorporated as a private corporation January 10, 1826[1] by citizens of Maryland, and functioned until 1835 when the school plant was destroyed by fire.[2] The activities of the school were resumed in 1847 and steps were taken resulting in the incorporation of the Institute as a private corporation (for a period of 30 years) on February 13, 1850. (Acts of Assembly 1849, c. 114). The charter of the corporation was extended by Chapter 313 of the Acts of Assembly 1878, and by this Act an annual grant of $3,000 was to be paid by the State to the president of the Institute, without condition other than an annual report of activities to the Governor of the State. The principal cor-porate purpose and power was to promote the mechanic arts and maintain schools of art and design.

Negotiations between the Institute and the City of Baltimore concerning the site of the school resulted in an ordinance dated June 6, 1850 (Ordinance No. 43 of June 6, 1850) which granted permission to the Managers of the Institute to erect a building for the Institute's use over the Market House at Centre Market (similar to Fanueil Hall in Boston) provided the plans for the building were approved by a Committee from the City Council, that the stall owners in the Market assent and that there be no interference with the use of the ground floor as a market. The City agreed to contribute $15,000 to the erection of a building on the condition that an equal amount be raised by public subscription. It was also provided that the hall to be constructed should be available rent free for any public meetings called by the Mayor. The actual cost of the building erected pursuant to this authorization was about $110,000, of which amount the City contributed approximately $20,000.[3]

The building erected by the Institute was occupied as the home of the School until the structure was destroyed in the great fire of February 7–8, 1904, which swept over this and surrounding blocks. The City of Baltimore, acting pursuant to Chapter 87 of the Laws of Maryland 1904, condemned the land in the Centre Market area, acting through the Burnt District Commission. A realignment of streets was made in the area and a special "Centre Market Commission" appointed by the then Mayor erected, using public funds, the present Market Place structure at a cost of about $190,000.[4]

By the Ordinance of the Mayor and City Council of Baltimore dated February 27, 1907[5] the Mayor was authorized to ex-

---

[1] Laws of Maryland 1825, c. 4.

[2] Maryland Institute Reports 1897-98, Library of Bureau of Legislative Reference, City Hall, Baltimore, Maryland.

[3] For subsequent Resolutions dealing with specific problems arising under this Ordinance, see Res. #43 of April 4, 1851 (providing for the payment of the agreed $15,000), and Res. #139 of June 23, 1851 (arrangement of market stalls, etc.)

[4] For a complete report of the actions and discussions of the Centre Market Commission, see Minutes of the Commission, Library of Legislative Reference, City Hall, Baltimore, Md.

[5] Ordinance #233 of Mayor & City Council of Baltimore, Feb. 27, 1907.

ecute a lease of the two upper stories of this new Market Place Building to the Institute for a period of 14 years commencing May 1, 1907, at the annual rent of $500, the lessee agreeing to make necessary repairs, and the City agreeing to furnish heat. Pursuant to a later Ordinance [6] a renewal of this lease was executed on May 11, 1921, for a period of 14 years. Since the expiration of this lease no further lease has been executed but the parties have apparently continued the relation of landlord and tenant on the same terms, being now a holdover yearly tenancy. Some years ago, the use of the ground floor for a market was discontinued and thereupon Baltimore City made some changes in the first floor to adapt it for further use by the Maryland Institute, at a cost of $25,000, but without increasing the rental of $500 a year. However, for some years past the Maryland Institute has been charged with and paid the cost of heating the building at about $2,000 or more per year.

Throughout the years from 1881 to the present the City of Baltimore has maintained a contract relationship with the Maryland Institute for the education of pupils in the schools of the Institute. These contracts have been much alike. By Ordinance No. 42 dated April 14, 1881, the City of Baltimore authorized the Mayor, City Comptroller and City Register to contract with the Maryland Institute for the instruction of a number of pupils in the School of Art and Design for a period of three years from September 1, 1881. Initially three pupils were to be appointed from each ward, and in the succeeding years one pupil was to be appointed by each member of the City Council. When a vacancy occurred the President of the Institute was to notify the member of the City Council entitled to fill the vacancy and the Councilman was then to appoint another pupil. Section 3 of the Ordinance required the President of the Institute in September of each year to report the names of the pupils so appointed and the vacancies existing, if any, and gave the Mayor the right to appoint should any member of the City Council entitled to fill a vacancy fail to do so for a period of two months. Section 4 of the Ordinance provided that the Mayor, City Comptroller and City Register should annually inspect the school and the manner in which the contract was being fulfilled, and if after such inspection the Comptroller was satisfied that the terms of the contract were being complied with he should pay the Institute $3,000 in September of each year for the education of the pupils.

A further contract in similar form, but providing for a payment of $9,000 was authorized on March 7, 1893.[7] This authorization was for a period of eight years from September 1, 1892 (sic). This Ordinance of March 1893 was discussed at length in the case of Clark v. Maryland Institute for the Promotion of Mechanic Arts, 87 Md. 643, 41 A. 126. The same arrangement was continued for a still further period of eight years from January 1, 1901.[8]

By another Ordinance approved May 18, 1908 [9] the City authorized the extension of this contract relationship for a period of twelve years from January 1, 1909, on the same basis but at the annual figure of $12,000. This renewal, which normally would have terminated on January 1, 1921, appears never to have been formally extended but the arrangement has continued down to date, the amount of money appropriated annually varying in the later years, averaging about $25,000 a year in the recent years.

Subsequent to the fire in 1904 the Maryland Institute felt in need of larger facilities to meet its increasing enrollment. There had been a total of $101,500 in insurance outstanding on the old Market Place Building, and from this insurance about $85,000 was realized as a result of the inability of some of the insurance com-

---

[6] Ordinance #604 of Mayor & City Council of Baltimore, June 4, 1921.
[7] Ordinance #26 of Mayor & City Council of Baltimore, March 7, 1893.

[8] Ordinance #74 of Mayor & City Council of Baltimore, Oct. 15, 1900.
[9] Ordinance #115 of Mayor & City Council of Baltimore, May 18, 1908.

panies to pay the loss in full.[10] The Legislature by Chapter 228 of the Laws of Maryland 1904, provided $175,000 to be used for the purchase of a lot and erection of a building for the Maryland Institute. With these available funds, plus a grant by Mr. Andrew Carnegie of $263,000 (apparently obtained by the personal solicitation of Mr. John M. Carter, then president of the Maryland Institute)[11] and the donation by Mr. Michael Jenkins of a lot at the corner of Mt. Royal Avenue and Lanvale Street, the new Maryland Institute Building was erected. The total cost of this new building was approximately $500,000.

On the first question with respect to the prayer for declaratory judgment, it is apparent that the crucial issue is whether the Maryland Institute is a corporation exercising governmental functions, or only a private corporation not subject to public control, and responsible for its own policies and management. If a private corporation only, its action in declining the application of the plaintiff does not constitute "State action". Summarizing from the above history the interrelations of the Maryland Institute and the City of Baltimore and the State of Maryland, I find that these relations consist only of the following:

1. The City for more than sixty years has made some annual payment to the Institute beginning with about $3,000 a year and presently amounting to about $25,000 a year under a contractual arrangement whereby each member of the City Council has the authority to appoint one student each year to the Institute free of tuition charges.

2. The City rents to the Maryland Institute a large building owned by the City in the commercial district of Baltimore for the annual rental of $500; a real estate agent expressed the opinion that, if the City decided to rent the building for commercial purposes, the annual rental probably would be between $11,000 and $12,000.

3. The only interrelations of the State of Maryland and the Maryland Institute are (1) the State by Act of the Legislature incorporated the Maryland Institute as a private corporation. Under the laws of incorporation the management of the corporation is entrusted to its members now consisting of 150 in number who annually elect the officers and twenty-one managers. The corporation has no outstanding stock, and it is generally called a non-profit corporation for certain educational purposes. (2) The State makes annual contributions to the Institute varying in amount and now about $16,500. For this contribution each of the 29 members of the Maryland Senate have the right to appoint to the Institute one student free of tuition charge. Currently the number of City and State students combined is about 100. The total enrollment of all students of all different classes at the Institute, including Mt. Royal Avenue Fine Arts Building and the Market Place Mechanical Arts Building, is about 2,000.

4. Neither the City nor the State exercise any control whatever in the management of the affairs of the Institute subject only to the possible qualification that the City has the right annually to examine the course of instruction given at the Institute to see that the terms of the contract for the appointment of students is being performed, and the Institute makes an annual report to the Governor of the State.

The tuition rates charged by the Institute are comparatively small, ranging from $190 a year for day classes in the Fine Arts Building on Mt. Royal Avenue, to about $25 per year for students at Market Place where only night classes are conducted three evenings a week. The tuition rates have been kept low in order to give the benefit of instruction to a larger number of students, with the result that the operating profit is kept very small.

The balance sheet of assets and liabilities of the Institute for 1947 shows net outright owned assets to the value of nearly $1,000,000, consisting of land and building (heavily depreciated), an endowment fund invested in stocks and securities of about $152,544.09, and an art collection accumulated over many years valued at $500,000.

---

[10] See Maryland Institute Reports, 1904-5, supra.

[11] See Maryland Historical Society Magazine, March 1948, p. 45, in article by Latrobe Weston.

The gross income of the Institute for the fiscal year 1947 was $184,302.71. Included in this amount was $26,000 received from the City of Baltimore for student appointments and $16,500 from the State of Maryland. The tuition fees at Mt. Royal Avenue Building amounted to $107,564.21, and from Market Place $18,770. The annual operating expenses aggregated $164,129.82 for that particular year leaving a net income of $20,172.89. The Market Place School had an operating deficit. The same net income for 1946 was only $13,759.48.

No officials of either the City or the State are members of the Institute nor on its Board of Directors, nor among its officers. Neither the City nor State has ever appointed any, and have no authority to do so. Mr. Young, the present President of the Institute, was for some years Collector of Taxes of Baltimore City; but that was purely coincidental as he succeeded both his father and grandfather as an officer of the Institute. Neither the City nor the State now has nor has ever had any control over the appointment of the Director of the Institute (presently Mr. Hans Schuler, the well-known Baltimore sculptor), or its teaching staff or other employees. The Institute maintains something in the nature of a pension fund for its employees but they are not included in either the City or State pension fund. Neither the City nor the State in any way exercise any control over or participation in the formulation of the annual budget of the Institute.

By the charter of Baltimore City under legislative authority public education is wholly conducted by a Board of School Commissioners (Md.Code 1939, Art. 77 § 182 et seq.; Baltimore City Charter). Ss. 91–93. The Maryland Institute is not in any way a part of the Public School System, nor in any way subject to the authority of the School Board. In the public schools of Baltimore City, both elementary and high schools, there are general courses given in drawing and other subjects of art. To some extent the Maryland Institute furnishes parallel courses in mechanical and artistic drawing but differs in that it also offers to advanced art students instructions tending to qualify them for teaching art in the public schools and elsewhere. But successful graduation from the Institute in such a course does not automatically qualify the graduate to appointment as a teacher in the City schools, but only qualifies him to take, along with other applicants, an examination for that purpose. The custom of segregation of the races, colored and white, has long prevailed in Baltimore City Schools where there are separate schools for colored pupils and for the white pupils.

The plaintiff in this case did not apply for admission to the Market Place School of the Institute, but for the Fine Arts Course and Teachers' Training Course conducted exclusively at the Mt. Royal Avenue Building. The plaintiff is a taxpayer in Baltimore but the amount of taxes paid by him does not appear in the pleadings or evidence. The plaintiff has not proven that he has sustained any pecuniary damage by refusal of the Institute to accept him as a student. He has not sought or received an appointment to a scholarship at the Institute.

## Opinion

The plaintiff's complaint is obviously patterned on the case of Kerr v. Enoch Pratt Free Library of Baltimore City, 4 Cir., 149 F.2d 212, certiorari denied 326 U.S. 721, 66 S.Ct. 26, 90 L.Ed. 427. In that case the Court of Appeals for this Circuit held, reversing this court, that the relations of the State of Maryland and Baltimore City to the Enoch Pratt Free Library, although originally incorporated by the State for management by a named Board of Trustees to be self-perpetuating, had resulted in making the Library an instrument of public education and therefore the refusal of the Board of Trustees to admit a young colored woman, otherwise qualified, to its instruction class for prospective librarians, solely on account of her race and color, constituted "State action" within the 14th Amendment. As that case constitutes the law of this Circuit, the question is immediately presented whether on its facts, or within its principle, it governs this case. If so, its rule must be followed here. Therefore the legal and factual situations of the Pratt Library must be closely compared with those of the Maryland Institute. The facts in the Pratt case are carefully

reviewed in the opinion of the court. It was at once conceded by counsel for the plaintiff in this case that the facts of the two cases are very different. The question is whether the nature and extent of the difference requires a difference in result. For convenience, the facts of the two cases with respect to the relations of the State and City to the respective corporations, may be compared in parallel columns as follows:

had applied "the rule, enunciated in state and federal courts, that to make a corporation a public one its managers must not only be appointed by public authority, but subject to its control. See 18 C.J.S., Corporations, § 18, p. 394, et seq.; Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 671, 4 L.Ed. 629." The opinion then cites a number of Maryland cases (two dealing with the Maryland Institute, Clark v. Maryland Institute for the Pro-

| | Enoch Pratt Library | Maryland Institute |
|---|---|---|
| Value of plant owned and used by | None | $500,000 (cost) |
| Value of plant owned by City but used by | Over $4,000,000 | Lessee for $500 per year of one City building which, for commercial purposes, would rent for $12,000 a year |
| Annual gross income from property or activities of | $6,000 to $8,000 | $184,000 |
| Annual sums paid by City and State | Over $800,000 | $42,500 (under contract for scholarships) |
| Proportion of public funds received to total budget | 99% | About 23% (under contract) |
| Public status of employees | Included in municipal employees retirement system | None |
| Control of disbursements by City | Made through City Bureau of Control and Accounts on vouchers submitted by Trustees | None |
| Salary checks for employees | Issued by City Payroll Officer | None |
| Salary of employees | Conform to City salary schedule | None |
| Control of budget | Submitted to municipal budget authorities | None |

The total effect of the State and City relations to the Pratt Library were summarized in the opinion of the Circuit Court of Appeals (page 215 of 149 F.2d). Just before doing so the opinion noted that the District Court in deciding the case there

motion of Mechanic Arts, 87 Md. 643, 41 A. 126, and St. Mary's Industrial School for Boys v. Brown, 45 Md. 310), which applied this general rule to the facts of the particular cases and held the Maryland corporations there involved to be private

458

corporations. It was then said "These decisions are persuasive but in none of them was the corporation under examination *completely owned and supported from its inception by the state as was the library corporation in the pending case."* (Italics supplied)

Therefore as I read the opinion in the Pratt case, the decision is placed not upon disapproval in principle of the rule announced in the Maryland cases, but on the ground that the facts in the Pratt case distinguished it from the cited Maryland cases, particularly Clark v. Maryland Institute for the Promotion of Mechanic Arts, and St. Mary's Industrial School for Boys v. Brown, supra, because the Court of Appeals concluded from the facts that the Pratt Library was "completely owned and supported from its inception by the state." No such factual conclusion seems possible with regard to the Maryland Institute.

As the factual situation in the instant case is not comparable to that in the Pratt case, it remains to be considered whether the case of the Maryland Institute is within the principle of constitutional law with regard to what constitutes State action decided in the Pratt case. As I read it, the opinion in that case does not establish any new principle of federal law but only applies previously established principles to the facts of the particular case. The opinion does point out very clearly that to determine whether the corporation is acting as a State agency or merely in a private capacity, the facts must be independently appraised by the federal court in order to have a uniform application of the 14th Amendment, and that therefore State decisions, although persuasive, are not controlling; and furthermore that in making the judicial appraisal of the effect of the facts, the court is not bound by narrow and technical rules of local law but must consider the question from the larger viewpoint of fundamental constitutional rights. Giving full weight to these well established principles the question remains in each factual situation whether the action taken amounts to State action.

[3] In the latest pronouncement of the Supreme Court upon this subject (in the "restrictive covenants" case) it was said in the opinion by the Chief Justice:

"Since the decision of this Court in the Civil Rights Cases, 1883, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835, the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely *private conduct, however discriminatory or wrongful."* (Italics supplied) Shelley v. Kraemer, 1948, 68 S.Ct. 836, 842.

In this case the discrimination was made by the Maryland Institute, a Maryland corporation. The ultimate question, therefore, is whether its action constituted private or public conduct. If the Institute is a private corporation, then its conduct is also private. The legal test between a private and a public corporation is whether the corporation is subject to control by public authority, State or municipal. To make a corporation public, its managers, trustees, or directors must be not only appointed by public authority but subject to its control. I understand this to be the well established general law resulting from both federal and state decisions. And I do not read the opinion in the Pratt case as disapproving that legal test. On the contrary, as I read the case, the court applied that test to the factual situation reaching the conclusion from its historical interpretation of the applicable legislation and financial history that the Trustees of the Pratt Library were in effect "representatives of the state to such an extent and in such a sense that the great restraints of the Constitution set limits on their action."

After extended consideration, I reach the conclusion that the legal and factual situation of the Maryland Institute does not bring its case within the scope of either the facts or the principle of the Pratt Library case. The present legislative charter of the Maryland Institute was contained in the Act of 1878, c. 313, and the prior expired charters are not essentially different in their provisions. By the Act of 1878 it was provided that the corporation should consist of its members from time to time

and should be managed by its officers and twenty-one managers annually elected by the members. The State made no designation of particular individuals as managers, and reserved no visitorial powers with regard to the management of the corporation other than the generally applicable legislation affecting private corporations. It has twice been expressly held by the Maryland Court of Appeals with respect to the Maryland Institute that it was not a public corporation according to the test of any reserved public control over the management of its affairs. In Clark v. Maryland Institute for the Promotion of Mechanic Arts, 87 Md. 643, 41 A. 126, 128, it was said in the opinion of the court:

"The Maryland Institute is essentially a private corporation. It was not created for political purposes, nor endowed with political powers. It is not an instrument of the government for the administration of public duties. It has none of the faculties, functions or features of a public corporation as they are designated in the Regents Case, 9 Gill & J. 365 [31 Am.Dec. 72], and the many other cases which have followed that celebrated decision. The Act of 1878, which renewed its charter, granted it the annual sum of $3,000, but this grant did not make it an instrumentality of government, nor make any change in its corporate character. The Regents Case, 9 Gill & J. [365], 398, [31 Am.Dec. 72], shows that it could not have such an effect. The Maryland Institute holds its property in its own right, and has the power to manage its concerns according to its own discretion within the limitations of its charter."

And in the earlier case of St. Mary's Industrial School for Boys v. Brown, 45 Md. 310, 329, 330, in opinion by Judge Alvey (afterwards Chief Judge of the United States Court of Appeals for the District of Columbia) it was said with regard to the corporations there involved, including the Maryland Institute:

"They are separate and distinct corporations, composed of private individuals, and managed and controlled by officers and agents of their own, and over which the City has no supervision or control, and for the management of which there is no accountability to the City whatever. No ordinance or resolution of the City Council can control the powers and discretion vested in the managing boards of these institutions, nor have the Mayor and City Council the power to determine who shall or who shall not receive the benefits of the charities dispensed by them."

And again, it was said in the opinion:

"So far, therefore, as the City is concerned, these corporations are entirely separate from and independent of it, in all corporate action and control. And as to the Maryland Institute for the Promotion of the Mechanic Arts, the mere fact that the City may own the ground upon which the building is erected, or that the City, in its deed to the institution, has reserved certain privileges in the use of the Hall, as part of the consideration for the grant, cannot constitute that corporation a municipal agency. It is, like the other corporations just mentioned, without municipal relation, and is under no obligation to the City to discharge any mere municipal function for which it can legally claim compensation."

This statement of the rule of law authorizing the test as to whether the corporation was public or private has been the consistently applied doctrine of the Maryland Court of Appeals for more than a hundred years. Regents Case, 1838, 9 Gill & J. 365, 31 Am.Dec. 72; Finan v. City of Cumberland, 154 Md. 563, 141 A. 269; University of Maryland v. Murray, 1935, 169 Md. 478, 182 A. 590, 103 A.L.R. 706. It is also the expressed federal rule as announced by the Supreme Court in the early cases of Dartmouth College v. Woodward, 4 Wheat. 518, 671, 4 L.Ed. 629, and Vincennes University, Board of Trustees v. Indiana, 14 How. 268, 276, 14 L.Ed. 416. It is likewise the general law upon the subject. 18 C.J.S., Corporations, § 18, p. 394, et seq. Most of these cases are cited and reviewed in the opinion in the Pratt case apparently without disapproval. With particular reference to the Maryland cases, the opinion referred to them as "persuasive" but not conclusive, with respect to the different factual situation presented by the history of the Pratt Library which, as the court found, was "*completely owned and supported from*

460

*its inception by the State"*. (Italics supplied)

From the above recited history of the Maryland Institute it appears that at least since 1881 there has been in force between the City and the Institute a contract whereby a certain number of free scholarships are allotted to nominees of the members of the City Council in consideration of which the City has paid to the Institute varying annual sums of $3,000 to $26,000 per year. In 1898 when the Clark case was decided the amount was $9,000. Presently it is $26,000. This not quite threefold increase is not disproportionate to the changing value of the dollar with respect to purchasing power. In the earlier case of St. Mary's School v. Brown, purely voluntary contributions had been made by Baltimore City to the several charitable and educational private corporations involved in that case. In a taxpayer's suit the Court of Appeals held that the City did not have legislative authority from the State to make these voluntary contributions to private corporations lacking in government control. But it was indicated that possibly a contractual relationship might be validly made between the City and the Institutions, or some of them. Apparently the contract with the Maryland Institute resulted from this suggestion. In the later Clark case the Court had before it the particular contract then in force between the City and the Institute. The existence of the contract was not considered to affect the legal status of the Institute as a purely private corporation not subject to public control. It did not make the Maryland Institute a part of the Public School System. 87 Md. p. 662, 41 A. 129.

■ Counsel for the plaintiff advances a new and far-reaching proposition not within the principle of the Pratt Library Case. The contention is that whenever the State or Baltimore City as a municipal agency of the State, advances moneys to a private corporation of an educational nature in an appreciably substantial amount which thereby becomes mingled with other general funds of the institution, that action of the institution or City thereby becomes State action within the scope of the 14th Amendment. No authority is cited for this proposition and I know of none. In my opinion it is untenable. It is directly contrary to the long established law and practice of Maryland. At each session of the Maryland Legislature there is passed an Omnibus Appropriations Bill giving State aid to may private institutions for educational and charitable purposes. It is, I think, common knowledge and my understanding that many of these State aided institutions are private corporations which currently admit as students or inmates only white persons; while others are for the benefit of only colored persons. This policy and action of the Maryland Legislature was expressly approved by the Court of Appeals of this State in the case of Clark v. Maryland Institute for Promotion of Mechanic Arts, supra.,[12] where it was said, at page 663 of 87 Md., at page 130 of 41 A.:

"But it cannot be doubted that the legislature has ample power to make appropriations to special objects, whenever, in its judgment, the public good would be thereby promoted. It has constantly exercised this power from the beginning of the State government. The legislature may make donations without regard to class, creed,

[12] For instance, see Laws of Maryland, 1945, pp. 1249–1252, making appropriations to the following educational institutions: Charlotte Hall School; the Johns Hopkins University; McDonogh School for Boys; Maryland Institute; St. John's College; Washington College; West Nottingham Academy and Western Maryland College. For many of these appropriations the State received from the Institutions a number of free scholarships. See also Md.Code, 1939, Art. 77, §§ 236–254. So far as I am aware all of these educational institutions are privately managed corporations receiving (possibly with some minor exceptions) only white students. Among the privately managed institutions of a charitable nature receiving State aid but exclusively for the benefit of colored persons I understand are Provident Hospital of Baltimore; St. Peter Clavers Industrial School (home for colored girls) and House of the Good Shepherd for Colored Girls. I also understand that other appropriations are made both by State and City to a "general welfare" fund distributed by State or City agencies to hospitals and other private charitable corporations that aid both white and colored irrespective of race or color, as for instance the Johns Hopkins Hospital.

color or previous condition of servitude. The only condition limiting this exercise of this power is that it must in some way promote the public interest. The state has never surrendered this power to the general government, and never can surrender it without stripping itself of the means of providing for the good order, happiness, and general welfare of society."

And finally on this part of the case, it is to be importantly noted that the plaintiff has not received an appointment, nor has he ever sought such an appointment, by the City to a free scholarship under the contract between the Institute and the City, and is therefore not suing as a beneficiary of the contract. Therefore, the case does not present for decision what may be the federal rights of a plaintiff having such an appointment.

I conclude therefore that the plaintiff is not entitled to the declaratory judgment prayed for because the act of discrimination did not constitute "State action". It results that that portion of the complaint must be dismissed.

Counsel for the plaintiff emphasizes the fact that the Market Place Building owned by the City is leased to the Maryland Institute for the nominal sum of $500 a year; and it is argued that in view of this fact the City is attempting to do indirectly what it could not do directly, that is, operate a public school contrary to the 14th Amendment. In support of this contention reference is made to a recent decision of the District Court for the Southern District of West Virginia in the case of Lawrence v. Hancock, 76 F.Supp. 1004. But the facts of that case are very different from the instant case. There the City under legislative authority constructed at its own cost with the proceeds of bond issues, a swimming pool for public recreation and then leased it to a private corporation for $1.00 a year for operation, and it excluded negroes. The facts recited in the opinion, however, led the district judge to the conclusion of fact that the lease was a mere strategem or device for the express purpose of excluding negroes.

The facts of this case entirely disprove any such existence of attempted evasion by the City. The Maryland Institute had been using a building on the same site constructed principally from its own funds, for fifty years prior to the great Baltimore fire of 1904. The land on which the building was constructed had always been owned by the City and the first floor had been used as a market. After the fire the City revised the surrounding streets but determined to rebuild the market and at the same time to construct two upper floors which later were rented to the Maryland Institute for continuation of its educational purposes in the field of the promotion of mechanical arts and mechanical drawing and design. The Fine Arts Department was, however, transferred to the new building on Mt. Royal Avenue erected at a cost of $500,000, none of which was contributed by the City, although some part was contributed by the State of Maryland. The bill of complaint in this case asks no relief with regard to the State's appropriations to the Maryland Institute. The policy of the Institute with regard to the admission of students was announced more than ten years before the new Market Place Building was built. The history of the matter, therefore, is quite inconsistent with any conclusion that the present lease of the building to the Maryland Institute is in the nature of an attempted evasion of constitutional rights. Moreover, the plaintiff has never applied for enrollment as a student at the Market Place building and the City has no relation whatever to the Institute's Mt. Royal Avenue building except its contractual relation for scholarships.

The *alternative relief* prayed for in the complaint invokes the equity jurisdiction of the court to enjoin the separate defendant, Baltimore City, from "appropriating any public money or allocating any public property or resources" to the Maryland Institute "if it is a private corporation beyond the restraints of the Federal Constitution and laws". The reasons assigned for the injunction are that such appropriation of public money is (1) ultra vires and void and (2) constitutes the taking of plaintiff's property without due process of law in violation of the 14th Amendment.

This part of the complaint, both as to jurisdiction of the court and on the merits

presents a different question from that heretofore discussed. Similar alternative relief was prayed for in the complaint in this court in the Pratt Library Case but was dismissed in the opinion of this court (54 F.Supp. 514, 526, 527); but on appeal it was found unnecessary to discuss that feature of the case. I have concluded that this alternative relief in the present case should not be granted for somewhat different reasons than those stated by this court in the Pratt Library Case.

The prayer for alternative relief here does not present a case within the jurisdiction of this federal court. The plaintiff asserts federal jurisdiction for both branches of the case relying particularly on section 41, subsections (1) (a) and (14) of title 28 U.S.C.A. Under section 41(1) (a) district courts are given jurisdiction of questions arising under the Constitution and the laws of the United States only where the amount in controversy exceeds $3,000 exclusive of interest and costs; while under subsection 14 the jurisdictional amount is not required. The relief prayed in this case against *the Institute* is for the alleged deprivation by State action of a *personal right of the equal protection of the laws*. And, therefore, the jurisdiction under subsection 14 was properly invoked without averment or proof of the amount in controversy. Douglas v. Jeannette, 319 U.S. 157, 162, 63 S.Ct. 877, 87 L.Ed. 1324; Hague v. C.I.O. 307 U.S. 496, 530, 59 S.Ct. 954, 83 L.Ed. 1423 (separate opinion of Justice Stone). But the prayer for alternative relief is essentially a taxpayer's suit to protect the plaintiff from being required to pay allegedly unlawful taxes and, therefore, of course, relating only to his property and not to a personal constitutional right. Federal jurisdiction of a suit of this nature falls under subsection (1) (a) of section 41 of title 28 which requires a showing that the amount in controversy exceeds $3,000. The complaint avers that the plaintiff is a taxpayer and the answer of the City admits this; but it is not alleged in the pleadings that the amount in controversy (that is the tax paid or to be paid by the plaintiff) exceeds $3,000; nor is there any proof in the case of any amount of taxes paid or to be paid by the plaintiff, by reason of the alleged invalid appropriation by the City. The charge that the appropriations are ultra vires obviously presents not a federal but only a State question. Snowden v. Hughes, 321 U.S. 1, 11, 64 S.Ct. 397, 88 L.Ed. 497; Owensboro Water Works Co. v. Owensboro, 200 U.S. 38, 47, 26 S.Ct. 24, 50 L.Ed. 361; Reese v. Holm, D.C., 31 F.Supp. 435. The only other ground assigned for federal jurisdiction is lack of due process under the 14th Amendment. But with respect to taxpayers' suits or where property interests are involved in such a case, there must be a showing of the requisite amount in controversy. Scott v. Frazier, 253 U.S. 243, 40 S.Ct. 503, 64 L.Ed. 883; Holt v. Indiana Mfg. Co., 176 U.S. 68, 20 S.Ct. 272, 44 L.Ed. 374; Murphy v. Puget Sound, D.C., 31 F.Supp. 318; Risley v. City of Utica, C.C.N.Y., 168 F. 737; Colvin v. Jacksonville, 158 U.S. 456, 460, 15 S.Ct. 866, 39 L.Ed. 1053; Rose Federal Jurisdiction and Procedure, 4th Ed. s. 218, pp. 219, 220; Dobie on Federal Procedure, § 72, pp. 253–255.

It results that we have in the one case two causes of action joined together, one within and the other without the federal jurisdiction. The question is whether when the court decides the question within federal jurisdiction on the merits, even though the relief is denied, it properly has jurisdiction to also decide the non-federal question. This very point was carefully considered in Hurn v. Oursler, 289 U.S. 238, 245, 53 S.Ct. 586, 589, 77 L.Ed. 1148, where, after stating the general rule that a federal court in such a situation may in certain cases decide both questions, it was added:

"But the rule does not go so far as to permit a federal court to assume jurisdiction of a separate and distinct nonfederal cause of action because it is joined in the same complaint with a federal cause of action. The distinction to be observed is between a case where two distinct grounds in support of a single cause of action are alleged, one only of which presents a federal question, and a case where two separate and distinct causes of action are alleged, one only of which is federal in character. In the former, where the federal

question averred is not plainly wanting in substance, the federal court, even though the federal ground be not established, may nevertheless retain and dispose of the case upon the nonfederal *ground;* in the latter it may not do so upon the nonfederal *cause of action."*

To the same effect see Pearce v. Pennsylvania R. Co., 3 Cir., 162 F.2d 524; FitzHenry v. Erie R. Co., D.C., 7 F.Supp. 880. The alternative relief in this case falls within the exception stated in Hurn v. Oursler, supra. It does not constitute any ground in support of the first cause of action but is itself a separate and distinct cause of action against a defendant other than the one involved in the first cause of action. It therefore follows that the court does not have jurisdiction of this alternative relief; while, of course, the State court does clearly have such jurisdiction. St. Mary's Industrial School for Boys v. Brown, 45 Md. 310 (a taxpayer's suit).

There are substantial reasons why the alternative relief prayed for should be litigated primarily in the State courts rather than in the federal courts. There is no diversity of citizenship between the parties and the suit is essentially merely a taxpayer's suit. It is generally preferable that such questions should be litigated in the State rather than in the federal courts. If the plaintiff relies upon a federal constitutional ground for resisting the tax and is unsuccessful in the Maryland Court of last resort, he can have the federal question determined by the Supreme Court of the United States. It is desirable that all questions of State law should be authoritatively decided by the State courts in such litigation before the federal constitutional question is presented for final determination by the Supreme Court.

There is still another substantial reason why federal jurisdiction should be declined in this case. The plaintiff seeks a remedy in equity by injunction contrary to a longstanding important feature of Maryland State policy. In balancing equities in this case it is apparent that the granting of the injunction would be of slight benefit to the plaintiff compared to the detriment of many Maryland State-

aided institutions. Federal courts should properly be reluctant to interfere by injunction with State policy unless there is undoubted jurisdiction, and substantial justice can be accomplished only by use of the extraordinary equitable remedy of an injunction. See Douglas v. Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324.

For these reasons I conclude as a matter of law that the alternative relief prayed for in the complaint must also be dismissed, for lack of jurisdiction and therefore "without prejudice".