### KERR et al. v. ENOCH PRATT FREE LIBRARY OF BALTIMORE CITY et al.

No. 5273.

Circuit Court of Appeals, Fourth Circuit.

April 17, 1945.

Charles H. Houston, of Washington, D. C. (W. A. C. Hughes, of Baltimore, Md., on the brief), for appellants.

John Henry Lewin, of Baltimore, Md. (Harry N. Baetjer and Allen A. Davis, both of Baltimore, Md., on the brief), for appellees.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This suit is brought by Louise Kerr, a young Negress, who complains that she has been refused admission to a library training class conducted by The Enoch Pratt Free Library of Baltimore City to prepare persons for staff positions in the Central Library and its branches. It is charged that the Library is performing a governmental function and that she was rejected in conformity with the uniform policy of the library corporation to exclude all persons of the colored race from the training school, and that by this action the State of Maryland deprives her of the equal protection of the laws in violation of § 1 of the Fourteenth Amendment of the Constitution of the United States and of the Civil Rights Act codified in 8 U.S.C. A. § 41. She asks for damages, as provided in that act, 8 U.S.C.A. § 43, for a permanent injunction prohibiting the refusal of her application, and for a declaratory judgment to establish her right to have her application considered without discrimination because of her race and color. Her father joins in the suit as a taxpayer, and asks that, if it be held that the library corporation is a private body not bound by the constitutional restraint upon state action, the Mayor and City Council of Baltimore be enjoined from making contributions to the support of the Library from the municipal funds on the ground that such contributions are ultra vires and in violation of the Fourteenth Amendment since they constitute a taking of his property without due process of law.

The defendants in the suit are the library corporation, nine citizens of Baltimore who constitute its board of trustees, the librarian and the Mayor and City Council of Baltimore. The defendants first named defend on two grounds: (1) That the plaintiff was not excluded from the Training School solely because of her race and color; and (2) that the Library is a private corporation, controlled and managed by the board of trustees, and does not perform any public function as a representative of the state. The municipality joins in the second defense and also denies that its appropriations to the Library are ultra vires or constitute a taking of property without due process of law. The District Judge sustained all of the defenses and dismissed the suit.

In our view it is necessary to consider only the first two defenses which raise the vital issues in the case. It is not denied that the applicant is well qualified to enter the training school. She is a native and resident of Baltimore City, twenty-seven years of age, of good character and reputation, and in good health. She is a graduate with high averages from the public high schools of Baltimore, from a public teachers' training school in Baltimore, has taken courses for three summers at the University of Pennsylvania, and has taught in the elementary public schools of the City. We must therefore consider whether in fact she was excluded from the training school because of her race, and if so, whether this action was contrary to the provisions of the federal constitution and laws.

There can be no doubt that the applicant was excluded from the school because of her race. The training course was established by the Library in 1928, primarily to prepare persons for the position of library assistant on the Library staff. There is no other training school for librarians in the state supported by public funds. Applicants are required to take a competitive entrance examination which, in view of the large number of applications for each class, is limited to fifteen or twenty persons who are selected by the director of the Library and his assistants as best qualified to function well in the work in view of their initiative, personality, enthusiasm and serious purpose. Members of the class are paid $50 monthly during training, since the practical work which they perform is equivalent to part time employment. In return for the training given, the applicant is expected to work on the staff one year after graduation, provided a position is offered. All competent graduates have been in fact appointed to the staff as library assistants, and during the past two or three years there have been more vacancies than graduates.

During the existence of the school, more than two hundred applications have been received from Negroes. All of them have been rejected. On June 14, 1933, the trustees of the Library formally resolved to make no change in the policy, then existing, not to employ Negro assistants on the Library service staff "in view of the public criticism which would arise and the effect upon the morale of the staff and the public." This practice was followed until 1942 when the trustees engaged two Negroes, who had not attended the Training School, as technical assistants for service in a branch of the Library which is patronized chiefly by Negroes. There are in all seventy senior and eighty junior library assistants employed at the Central Building and the twenty-six branches. There is no segregation of the races in any of them and white and colored patrons are served alike without discrimination. The population of Baltimore City is approximately eighty per cent white and twenty per cent colored.

Notwithstanding the appointment of two colored assistants in one branch of the Library, the board of trustees continued to exclude Negroes from the Training School for the reasons set forth in the following resolution passed by it on September 17, 1942:

"Resolved that it is unnecessary and unpracticable to admit colored persons to the Training Class of The Enoch Pratt Free Library. The trustees being advised that there are colored persons now available with adequate training for library employment have given the librarian authority to employ such personnel where vacancies occur in a branch or branches with an established record of preponderant colored use."

It was in accordance with this policy that the application made by the plaintiff on April 23, 1943, was denied.

The view that the action of the Board in excluding her was not based solely on her race or color rests on the contention that as the only positions as librarian assistants, which are open to Negroes, were filled at the time of her application, and as a number of adequately trained colored persons in the community were then available for appointment, should a vacancy occur, it would have been a waste of her time and a useless expense to the Library to admit her. The resolution of September 17, 1942, and the testimony given on the part of the defendants indicate that these were in fact the reasons which led to the plaintiff's rejection, and that the trustees were not moved by personal hostility or prejudice against the Negro race but by the belief that white library assistants can render more acceptable and more efficient service to the public where the majority of the patrons are white. The District Judge so found and we accept his finding. But it is nevertheless true that the applicant's race was the only ground for the action upon her application. She was refused consideration because the Training School is closed to Negroes, and it is closed to Negroes because, in the judgment of the Board, their race unfits them to serve in predominantly white neighborhoods. We must therefore determine whether, in view of the prohibition of the Fourteenth Amendment, the Board is occupying tenable ground in excluding Negroes from the Training School and from positions on the Library's staff.

The District Judge found that the Board of Trustees controls and manages the affairs of the Library as a private corporation and does not act in a public capacity as a representative of the state. Hence he held that the Board is not subject to the restraints of the Fourteenth Amendment which are imposed only upon state action that abridges the privileges or immunities of citizens of the United States or denies to any person the equal protection of the laws. His opinion, D.C., 54 F.Supp. 514, reviews at length the corporate history of the institution and applies the rule, enunciated in state and federal courts, that to make a corporation a public one its managers must not only be appointed by public authority, but subject to its control. See 18 C.J.S., Corporations, § 19, p. 394 et seq.; Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 671, 4 L.Ed. 629.

The Court of Appeals of Maryland has used this test in somewhat similar cases and has held corporations to be private in character although public funds have been placed at their disposal to aid them in serving the public in the exercise of functions which could appropriately be performed by the state itself. For example, the rule was applied in Clark v. Maryland Institute, 87 Md. 643, 41 A. 126, where a colored youth was refused admission to an educational institution to which he had been appointed by a member of the City Council of Baltimore under a contract between the City and the Institute which authorized each member of the Council to make one appointment in consideration of an annual ap-

propriation by the City of $9,000 per year for the education of the pupils. It was held that the Institute was within its rights in excluding colored persons because it was a private corporation and not an agency of the state, subject to the provisions of the Fourteenth Amendment. See also St. Mary's Industrial School v. Brown, 45 Md. 310; Finan v. City of Cumberland, 154 Md. 563, 141 A. 269; University of Maryland v. Murray, 169 Md. 478, 182 A. 590, 103 A.L.R. 706; University of Maryland v. Maas, 173 Md. 554, 197 A. 123; University of Maryland v. Williams, 9 Gill & J. 365, 31 Am.Dec. 72.

■ These decisions are persuasive but in none of them was the corporation under examination completely owned and supported from its inception by the state as was the library corporation in the pending case. Moreover, a federal question is involved which the federal courts must decide for themselves so that a final and uniform interpretation may be given to the Constitution, the supreme law of the land; and in the performance of this duty in the pending case, we should not be governed merely by technical rules of law, but should appraise the facts in order to determine whether the board of trustees of the library corporation may be classified as "representatives of the state to such an extent and in such a sense that the great restraints of the Constitution set limits to their action." Nixon v. Condon, 286 U.S. 73, 88, 89, 52 S.Ct. 484, 487, 76 L.Ed. 984, 88 A.L.R. 458; Smith v. Allwright, 321 U.S. 649, 662, 64 S.Ct. 757, 151 A.L.R. 1110.

With this test in view, we must examine the legal background and the activities of the Library. It was established in 1882 through the philanthropy of Enoch Pratt, a citizen of Baltimore. His purpose was to create an institution which would belong to the City of Baltimore and serve all of its people; but he was fearful lest its management might fall into the hands of local politicians who would impair its efficiency by using it for selfish purposes. Accordingly, he erected and furnished a central library building at a cost of $225,000 and provided a fund of $833,000 and gave them to the city on condition that the city would create a perpetual annuity of $50,000 to be paid to the Board of Trustees for the maintenance of the Library and the erection and maintenance of four branches. But he also made it a condition of the gift that a Board of Trustees, to be selected by him from the citizens of Baltimore, be incorporated, with the power to manage the Library and fill all vacancies on the Board irrespective of religious or political grounds, and with the duty to make an annual report to the city showing the proceedings, the condition of the Library, and its receipts and disbursements for the year. These conditions were met; the corporation was formed, and the conveyances by gift were made to and accepted by the city which assumed the required obligations.

The steps by which these objects were given legal effect included an Act of the Legislature of Maryland of March 30, 1882, Acts 1882, Ch. 181; Ordinance No. 106 of the city of July 15, 1882, Ordinance No. 64 of May 14, 1883, and Ordinance No. 145 of October 10, 1884. The Act described the terms of the gift and the means which it offered to perpetually promote and diffuse knowledge among the people of the city, empowered the city to accept the gift and to agree by ordinance, to be approved by the voters of the city, to make the stipulated annual payment and directed the city to appoint a visitor to examine the books and accounts of the trustees annually and report to the city, and in case of abuse by the trustees to resort to the proper courts to enforce the performance of the trust. The Act also named nine citizens of Baltimore to constitute the Board of Trustees and to be a body corporate by the name of "The Enoch Pratt Free Library of Baltimore City," and empowered them to fill vacancies in the Board and to do all necessary things for the control and management of the Library and its branches, and to make all necessary by-laws and regulations for the administration of the trust and the appointment of necessary officers and agents. The trustees were directed to make an annual report to the city of their proceedings and of the condition of the Library, with a full account of receipts and disbursements. The real and personal property vested in the city by virtue of the act, as well as future acquisitions, were exempted from state and city taxes. The ordinances of the city contained appropriate provisions to give effect to the plan.

The Library was managed and conducted in accordance with these provisions until the year 1907 when Andrew Carnegie gave the city $500,000 for the erection of twenty additional branch buildings on the sole condition that the city should provide the sites and an annual sum of not less than ten

per cent of the cost of the buildings for maintenance. The city accepted the gift upon these conditions by Ordinance No. 275 of May 11, 1907, and directed that the annual appropriation be expended by the trustees for the branch libraries in such manner as might be specified by the city from year to year in its ordinance of estimates. The legislature impliedly ratified the gift by the Act of 1908, Ch. 144, by enacting an amendment to the city charter empowering the city to appropriate and pay over such sums as it might deem proper for the equipment, maintenance or support of the library, provided that the title of ownership to the property should be vested in the Mayor and City Council of Baltimore.

By the year 1927 the central library had outgrown its quarters and the Legislature of the state, by the Act of 1927, Ch. 328, authorized the city, if the voters should approve, to issue bonds in the sum of $3,000,000 for the acquisition of additional real estate and the erection of a new building for a free public library in Baltimore City. The bond issue was authorized by Ordinance No. 1053 of April 13, 1927, which was submitted to and approved by the voters. Thereafter the city acquired the necessary land and erected thereon a modern library which constitutes the central building of the institution. Ordinance No. 1195, approved December 16, 1930, authorized the incorporation into the new site of the land previously occupied by the central building. The building has been completed and has been in use for some years past. The Library now includes this central building and twenty-six branches.

The existing fiscal arrangement between the city and the Library throws strong light on the question now under consideration. The work of the Library has been so expanded and its usefulness to the people of Baltimore has been so clearly demonstrated under the management of the Board of Trustees that the city has gradually increased its annual appropriations until they far exceed the obligations assumed by it under the gifts from Enoch Pratt and Andrew Carnegie. These obligations, as we have seen, amounted to the annual appropriation of $50,000 to meet the condition imposed by Mr. Pratt, offset by the income from the capital sum of $833,000 donated by him, and also the annual appropriation of $50,000 to meet the condition of Mr. Carnegie's gift. But in addition, the city has appropriated large additional sums. The total amounted to $511,575 in 1943 and $650,086.90 in 1944. In addition the city pays large sums for bond interest, bond retirement, and the retirement funds for library employees which in 1944 amounted to $82,160 for bond interest, $86,000 for bond retirement and $40,000 for the retirement fund, so that the city's total contribution to the Library for the year 1944 totaled the sum of $858,246.90.

Until ten years ago the appropriations made by the city were turned over to the trustees to be expended for library purposes; but for the past ten years all disbursements from city appropriations are made through the City Bureau of Control and Accounts on vouchers submitted by the trustees to the Bureau for payment. Salary checks are issued by the city's payroll officer and charged against the Library's appropriation. Library employees are not under the city's merit system, but their salaries conform to the city's salary scale and if an increase in salary or the creation of a new position is desired, the trustees are obliged to take up the matter with the Board of Estimates. The trustees submit an itemized budget to the city which is reviewed by the city's budget committee and the library budget is included in the regular city budget. All of the income of the Library is thus received from and disbursed by the city with the exception of an annual income of special gifts which has recently averaged from $6,000 to $8,000 annually, or about one per cent of the city's outlay.

By the Act of Legislature of 1939, Ch. 16, the city was authorized to include library employees within the municipal employees' retirement system, and this arrangement was accomplished upon the request of the trustees of the Library by Ordinance No. 961 of May 29, 1939. The annual contribution of the city to the retirement fund for library employees is about $40,000.

From this recital certain conclusions may be safely drawn. First. The purpose which inspired the founder to make the gift and led the state to accept it, was to establish an institution to promote and diffuse knowledge and education amongst all the people.

Second. The donor could have formed a private corporation under the general permissive statutes of Maryland with power both to own the property and to manage the business of the Library independent of the state. He chose instead to seek the aid

of the state to found a public institution to be owned and supported by the city but to be operated by a self perpetuating board of trustees to safeguard it from political manipulation; and this was accomplished by special act of the legislature with the result that the powers and obligations of the city and the trustees were not conferred by Mr. Pratt but by the state at the very inception of the enterprise. They were in truth created by the state in accordance with a plan which was. in quite general operation in the Southern and Eastern parts of the United States at the time.*

Third, during the sixty years that have passed since the Library was established, the city's interests have been greatly extended and increased, as the donor doubtless foresaw would be the case, until the existence and maintainence of the central library and its twenty-six branches as now conducted are completely dependent upon the city's voluntary appropriations. So great have become the demands upon the city that it now requires the budget of the Library to be submitted to the municipal budget authorities for approval and in this way the city exercises a control over the activities of the institution.

We are told that all of these weighty facts go for naught and that the Library is entirely bereft of governmental status because the executive control is vested in a self perpetuating board first named by Enoch Pratt. The District Court held that Pratt created in effect two separate trusts, one in the physical property, of which the city is the trustee, and the other a trust for management, committed to the board of trustees, and that the purpose and effect of the act of the legislature "was merely to ratify and approve the agreement between Mr. Pratt and the city, and to give the necessary authority of the state to the city to carry out the agreement"; and that the practical economic control of the Library by the city, by virtue of its large voluntary contributions, is immaterial, because "the problem must be resolved on the basis of the legal right to control and not possible practical control through withholding appropriations."

■ We do not agree with this analysis of the situation. It is generally recognized that the maintenance of a public library is a proper function of the state; and nowhere has the thought been better expressed than in Johnson v. Baltimore, 158 Md. 93, 103, 104, 148 A. 209, 213, 66 A.L.R. 1488, where the court said:

" * * * At the present time it is generally recognized and conceded by all thoughtful people that such institutions form an integral part of a system of free public education and are among its most efficient and valuable adjuncts. An enlightened and educated public has come to be regarded as the surest safeguard for the maintenance and advancement of the progress of civilized nations. More particularly is this true in republican forms of government, wherein all citizens have a voice. It is also true that education of the people ought not to and does not stop upon their leaving school, but must be kept abreast of the time by almost constant reading and study. It would therefore seem that no more important duty or higher purpose is incumbent upon a state or municipality than to provide free public libraries for the benefit of its inhabitants."

■ It is equally true that the state may set up a board of trustees as an incorporated instrumentality to carry on its educational work, as it has done in the case of the University of Maryland. See University of Maryland v. Murray, 169 Md.

* We learn from Joeckel, The Government of the American Public Library, University of Chicago Press, 1935, that the oldest form of free public library existent today is that having a corporate existence. Accurate description of the libraries comprising this group is impossible because of the many variations of legal detail but the essential distinction between these and other public libraries lies in the fact that control and sometimes ownership is vested wholly or in part in a corporation, association or similar organization which is not part of the municipal or other government. Frequently there is some form of contractual relationship between the corporation and the city. But regardless of legal organization, these libraries all render service freely to all citizens on precisely the same terms as public libraries under direct municipal control. No less than 56 or 17% of all the public libraries in American cities having a population in excess of 30,000 fall into this category. Geographically these libraries are confined to the East and especially to the South where more than one-third of the cities in the 30,000 or over population group are served by libraries of this type. The Enoch Pratt Free Library belongs to this group.

479, 182 A. 590, 103 A.L.R. 706; Maryland Declaration of Rights, Article 43, Md.Code 1939, Art. 77, Sec. 15. It is our view that although Pratt furnished the inspiration and.the funds initially, the authority of the state was invoked to create the institution and to vest the power of ownership in one instrumentality and the power of management in another, with the injunction upon the former to see to it that the latter faithfully performed its trust. We know of no reason why the state cannot create separate agencies to carry on its work in this manner, and when it does so, they become subject to the constitutional restraints imposed upon the state itself.

■ We think that the special charter of the Library should not be interpreted as endowing it with the power to discriminate between the people of the state on account of race and that if the charter is susceptible of this construction, it violates the Fourteenth Amendment since the Board of Trustees must be deemed the representative of the state. The question of interpretation is not unlike that which was before the Supreme Court in Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, where it was held that a labor union which was empowered by the Federal Railway Labor Act to represent a whole craft of employees could not discriminate against Negro members thereof. The court said, 65 S.Ct. at pages 230, 232:

"If, as the state court has held, the Act confers this power on the bargaining representative of a craft or class of employees without any commensurate statutory duty toward its members, constitutional questions arise. For the representative is clothed with power not unlike that of a legislature which is subject to constitutional limitations on its power to deny, restrict, destroy or discriminate against the rights of those for whom it legislates and which is also under an affirmative constitutional duty equally to protect those rights. If the Railway Labor Act purports to impose on petitioner and the other Negro members of the craft the legal duty to comply with the terms of a contract whereby the representative has discriminatorily restricted their employment for the benefit and advantage of the Brotherhood's own members, we must decide the constitutional questions which petitioner raises in his pleading.

\* \* \* \* \*

"We think that the Railway Labor Act imposes upon the statutory representative of a craft at least as exacting a duty to protect equally the interests of the members of the craft as the Constitution imposes upon a legislature to give equal protection to the interests of those for whom it legislates. Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents, cf. J. I. Case Co. v. National Labor Relations Board, supra, 321 U.S. [332], 335, 64 S.Ct. 579 [88 L.Ed. 762], but it has also imposed on the representative a corresponding duty. We hold that the language of the Act to which we have referred, read in the light of the purposes of the Act, expresses the aim of Congress to impose on the bargaining representative of a craft or class of employees the duty to exercise fairly the power conferred upon it in behalf of all those for whom it acts, without hostile discrimination against them."

For like reasons we think that the charter of the Library which empowers the Board of Trustees to manage the institution for a benevolent public purpose should not be construed to authorize them to pass a regulation in respect to the appointment of its agents which violates the spirit of the constitutional prohibition against race discrimination. Nor do we assume that the act would be so interpreted by the Court of Appeals of Maryland which in Mayor &c. v. Radecke, 49 Md. 217, 33 Am.Rep. 239, pointed out the duty of the courts to look beneath the language of an act to find the true purpose of a grant of legislative power. In that case the court said: "While we hold that this power of control by the Courts is one to be most cautiously exercised, we are yet of opinion there may be a case in which an Ordinance passed under grants of power like those we have cited, is so clearly unreasonable, so arbitrary, oppressive or partial, as to raise the presumption that the Legislature never intended to confer the power to pass it, and to justify the Courts in interfering and setting it aside as a plain abuse of authority."

■ In any event, it is our duty in this case in passing upon the nature of the library corporation and its relationship to the state not to be guided by the technical rules of the law of principal and agent, but to apply the test laid down in Nixon v.

Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984, 88 A.L.R. 458, to which we have already referred. There the Supreme Court held that an executive committee of a political party, which had been authorized by a Texas statute to determine the qualification of the members of the party, was not acting merely for the political organization for which it spoke but was acting as a representative of the state when it excluded Negroes from participation in a primary election. In declaring that this action was subject to the condemnation of the Fourteenth Amendment the court said (286 U.S. at pages 88, 89, 52 S.Ct. at page 487, 76 L.Ed. 984, 88 A.L.R. 458):

" * * * The pith of the matter is simply this, that, when those agencies are invested with an authority independent of the will of the association in whose name they undertake to speak, they become to that extent the organs of the state itself, the repositories of official power. They are then the governmental instruments whereby parties are organized and regulated to the end that government itself may be established or continued. What they do in that relation, they must do in submission to the mandates of equality and liberty that bind officials everywhere. They are not acting in matters of merely private concern like the directors or agents of business corporations. They are acting in matters of high public interest, matters intimately connected with the capacity of government to exercise its functions unbrokenly and smoothly. Whether in given circumstances parties or their committees are agencies of government within the Fourteenth or the Fifteenth Amendment is a question which this court will determine for itself. It is not concluded upon such an inquiry by decisions rendered elsewhere. The test is not whether the members of the executive committee are the representatives of the state in the strict sense in which an agent is the representative of his principal. The test is whether they are to be classified as representatives of the state to such an extent and in such a sense that the great restraints of the Constitution set limits to their action."

For further application of this principle, see Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987.

■ We have no difficulty in concluding that in the same sense the Library is an instrumentality of the State of Maryland. Even if we should lay aside the approval and authority given by the state to the library at its very beginning we should find in the present relationship between them so great a degree of control over the activities and existence of the Library on the part of the state that it would be unrealistic to speak of it as a corporation entirely devoid of governmental character. It would be conceded that if the state legislature should now set up and maintain a public library and should entrust its operation to a self perpetuating board of trustees and authorize it to exclude Negroes from its benefits, the act would be unconstitutional. How then can the well known policy of the Library, so long continued and now formally expressed in the resolution of the Board, be justified as solely the act of a private organization when the state, through the municipality, continues to supply it with the means of existence.

The plaintiff has been denied a right to which she was entitled and the judgment must be reversed and the case remanded for further proceedings.

Reversed and remanded.