Barbara Marie GUILLORY and Pearlie Hardin Elloie, Plaintiffs,

v.

The ADMINISTRATORS OF the TULANE UNIVERSITY OF LOUISIANA, and Herbert E. Longenecker, President of Tulane University of Louisiana, and the Administrators of the Tulane Educational Fund, Defendants.

Civ. A. No. 11484B.

United States District Court
E. D. Louisiana,
New Orleans Division.

Dec. 5, 1962.

Pilie, Nelson & Limes, John P. Nelson, Jr., Katherine S. Wright, New Orleans, La., for plaintiffs.

Guste, Barnett & Little, John Pat Little, Wood Brown, III, New Orleans, La., for defendants.

FRANK B. ELLIS, District Judge.

This action for injunctive and declaratory relief was filed Sept. 1, 1961. Defendants responded with motions to quash service, dismiss and abstain. Plaintiffs filed a motion for summary judgment supported by affidavits and briefs. Defendant also moved to strike certain articles of evidence. The District Court as then constituted granted plaintiffs motion for summary judgment, denied the motions to quash, dismiss and abstain, and granted and denied in part defendants' motion to strike exhibits. Guillory v. Administrators of Tulane University of La., E.D.La., 203 F.Supp. 855. Thereafter, defendants filed motions for new trial and for rehearing. This Court granted a stay of the judgment and granted the rehearing. On rehearing, this Court found that substantial facts were still in issue and there-

fore vacated the summary judgment and set the matter down for trial on the merits. Subsequently defendants were permitted to file third party complaints against the heirs of Paul Tulane and Sophie Newcomb and Harry Gamble, Jr., as representative of the class of later donors who might claim their donations had implied restrictions similar to those in Paul Tulane's donation.[1] Guillory v. Board of Administrators of Tulane Educational Fund, E.D.La., 207 F.Supp. 554, and this judgment was affirmed by the Fifth Circuit Court of Appeals, 306 F.2d 489.

Defendants have reurged their motions to dismiss, quash, and abstain. Issue was ultimately joined. The case came on for trial August 3, 1962 and was fully heard, argued and briefed.

Plaintiffs, in this action, seek admission to the Tulane University of Louisiana. They are admittedly qualified in every respect.[2] They have been refused admission solely because they are Negroes. The question before this Court is whether plaintiffs can constitutionally be excluded from the Tulane University of Louisiana solely because of their race.

Plaintiff's position is that the Fourteenth Amendment to the United States Constitution prohibits racial discrimination by Tulane University under the doctrine of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873.

Defendants' position is that the Fourteenth Amendment does not apply to Tulane University because it is a "private individual" under the doctrine of the Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835, enunciating the proposition that the Fourteenth Amendment does not apply to private individuals.

The source of Tulane's present policy is the act of donation of one Paul Tulane, a philanthropist and early benefactor of the University. That act, which prompted the incorporation of the Administrators of the Tulane Educational Fund on May 29, 1882, restricted the use of the funds donated to "young white persons." A later gift by one Sophie Newcomb included a similar restriction. The necessity of the Administrators' compliance with the terms of Paul Tulane's donation is embraced in its corporate charter [3] as well as the statutory law of the State of Louisiana by Act 43 of 1884, LSA–R.S. Tit. 17, c. 6 note included in the Louisiana Constitution by Art. 269 of 1888. Thus, although the Administrators of the Tulane Educational Fund are on official record as desiring otherwise [4], the Administrators stand on the position that they are legally bound to restrict admissions to Tulane University to white persons and, moreover, that this restriction is constitutionally permissible because Tulane University of Louisiana is a "private school." [5]

---

1. On appeal of the vacation of summary judgment of the Fifth Circuit ordered that the main action proceed separately to trial without deciding the impleader action. Hence decision on the impleaders is pretermitted. The third party defendants have either moved to quash or answered and in the case of Harry Gamble, Jr., have filed briefs in opposition to the main demand.

2. On the trial of this case it was stipulated that plaintiffs were refused admission on the basis of race alone. See Trial Transcript Vol. II, p. 287. Hence there is no need for a preliminary finding that plaintiffs are otherwise qualified. See Meredith v. Fair, 5 Cir., 305 F.2d 343.

3. See Preamble, Corporate Charter, Administrators of Tulane Educational Fund.

4. "The Administrators of the Tulane Educational Fund met Wednesday and voted that Tulane University would admit qualified students regardless of race or color if it were legally permissible to do so." Minutes of the Administrators of the Tulane Educational Fund, April 12, 1961.

5. It is this fact which makes abstention inappropriate. Were this case presented to the Louisiana courts initially, even presuming plaintiffs had a procedural remedy in state court, the issue would be the same as it is here, i. e. can Tulane discriminate on the basis of race in the face of the Fourteenth Amendment. Abstention is intended to avoid constitutional issues, not simply shift their determination from federal to state court.

Certain principles are beyond question. The Fourteenth Amendment demands that a State treat all of its citizens alike unless there is sufficient reason to treat them differently. The essence of the proposition is not unequal treatment; it is different treatment. In the field of education, a State institution may treat its citizens differently according to academic ability [6] but not according to race.[7] Furthermore, the State may not effect such different treatment indirectly, nor, more importantly, may it involve itself with such different treatment actively or passively.[8] However, the Fourteenth Amendment limits its application to the "States,"[9] and when private individuals choose to discriminate, the Courts have no right to interfere.[10] Finally, when discrimination according to race occurs, the courts must determine whether the state, or a private individual, or the state and a private individual, are acting. And it is this final proposition which brings this case here.

It is the finding of this Court that the Administrators of the Tulane Educational Fund (hereinafter referred to as Tulane Board) is a private corporation, privately endowed, and engaged in the activity of academic instruction and pursuit. The evidence is overwhelming on this point. The corporation was formed on May 29, 1882, before Notary Charles G. Andry in the City of New Orleans. Its stated corporate purpose was: "To hold property, both real and personal, by purchase or donation, for education purposes, to use and dispose of the same upon the terms and conditions upon which said property is or may be donated or acquired." The reason for a corporation with such a purpose was an act of donation of Paul Tulane on May 2, 1882, in which he expressed his desire to donate money for the "promotion and encouragement of intellectual, moral and industrial education among the young white persons in the City of New Orleans, State of Louisiana. * * *"[11] This Board can sue [12] and be sued [13] in their own name, borrow money in their own name [14], receive donations in their own name [15], and make contracts in their own name [16] much the same as any other private corporation. The Supreme Court of Louisiana expressly stated that this body was a private corporation.[17] Being es-

6. Shuttlesworth v. Birmingham Bd. of Ed. of Jefferson County, Alabama, N.D.Ala., 162 F.Supp. 372, aff'd, 385 U.S. 101, 79 S.Ct. 221, 3 L.Ed.2d 145.

7. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873.

8. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5; Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161; Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45; Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152.

9. "No State shall make or enforce any law which shall * * * deny to any person within its jurisdiction the equal protection of the laws." U.S.Const. Amend. XIV.

10. Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835.

11. Paul Tulane was a merchant who had prospered during the commercial ascendency of New Orleans. At the time of this donation he was living in Princeton, New Jersey, and the mechanics of the foundation and incorporation were worked out by Paul Tulane, Preston Johnson, U. S. Representative Randall Gibson, Charles E. Fenner and (Chief Justice) William Douglass White.

12. Tulane Education Fund's Administrators v. Board of Assessors, 38 La.Ann. 292.

13. Succession of Hutchinson, 112 La. 656, 36 So. 639; State v. Board of Administrators of the Tulane Educational Fund, 125 La. 432, 51 So. 483.

14. In 1956 University Center First Mortgage Bonds in the amount of $1,800,000 were issued "for and on behalf and in the name of the Administrators of the Tulane Educational Fund." Similar loans by bond indenture have been made on other occasions.

15. The University Comptroller testified that money received was endorsed by the Administrators of the Tulane Educational Fund and deposited in an account in that name.

16. Act 43 of 1884.

17. State v. Board of Administrators of the Tulane Educational Fund, supra.

678

sentially private, its acts, without more, are "private" acts in the constitutional sense.

Paul Tulane made it clear that he was not limiting the Administrators in the manner in which they would fulfill his purpose to promote higher education. His express suggestions that the Administrators distribute the property or its proceeds to educational or literary institutions in the City of New Orleans and his desire that the Administrators not be bound to contribute the funds to any particular institution supports this conclusion.[18] In short the Administrators of the Tulane Educational Fund was a corporation with very broad powers to administer the funds received from Paul Tulane and all subsequently received funds in a way that best fulfilled Paul Tulane's main purpose. This autonomy, so vital to the private corporation, still exists today in the operations of the corporation. When the Administrators set out to fulfill this aim to aid higher education, they were entering on an essentially "private" endeavor, and in the sense that Paul Tulane sought to create a private foundation, that endeavor is still private.

Blessed with $1,000,000 in assets and considerable autonomy the Administrators sought to fulfill Paul Tulane's wishes in the quickest and most profitable way. Realizing that a long and tortuous road lay ahead, the Administrators looked on the already-established and operating University of Louisiana in the City of New Orleans as an opportunity to start much further along the way to academic success as well as a way out of the tax dilemma which faced them. The Louisiana Constitution of 1845 provided that a university would be established in the City of New Orleans composed of faculties of law, medicine, natural sciences and letters. It was called the University of Louisiana and the already-existing Medical College of Louisiana composed the medical faculty. While the State con-

trolled and organized the school, there was no obligation for support by appropriation. Substantially the same provisions were included in the Louisiana Constitution of 1864, Art. 143. The Constitution of 1868 repeated the prior provisions but added that " * * * all departments of this institution of learning shall be open in common to all students capable of matriculating." The Louisiana Revised Statutes of 1870 had adopted comprehensive legislation governing the University of Louisiana. The Constitution of 1879 recognized the University of Louisiana with three departments and, for the first time, provided for in appropriation not to exceed $10,000.00 annually. Thus, at the time of the incorporation of the Administrators of the Tulane Educational Fund, there was a ready-made university in the City of New Orleans. (This university is not to be confused with Louisiana State University operating in Baton Rouge.)

Thus the Administrators approached the State of Louisiana with the proposition that it take over the University of Louisiana and dedicate its property and all revenues received by the Tulane board for the two-fold purpose of getting the benefits of a small university already in being and by state legislative and constitutional authority to obtain a tax exempt status. Act 43 of the Louisiana Legislature of 1884 was the result. It is important to understand matters as they stood in 1884 and today. A private corporation, desirous of promoting higher education, freely approached the State of Louisiana for the purpose of adopting an educational activity presently engaged in by the State. The State was amenable to letting this private corporation take up the activity and was further amenable to turning over state property for this purpose and proposed that it be done by contract between the Legislature and the Board. Within the four corners of that contract, if at all, lies the sum of the state involvement with this private ac-

18. See Charter of Administrators of the Tulane Educational Fund, p. 10, Plaintiff's Exhibit #2.

tivity.[19] Constitutionally speaking then, the only state action involved in the activities of the Administrators, commonly called Tulane University of Louisiana, is Act 43 of 1884 and its amendments. All else, save what the parties may mutually agree upon in the future, is the academic activity of a private corporation. This conclusion is supported by no less an authority than a landmark of American jurisprudence, Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518, 7 L. Ed. 629. In 1754 King George III of England had chartered Dartmouth College as an institution for the purpose of promoting education in the province of New Hampshire. It was privately endowed and supported. The original board included the governor of the province, several council members, and the speaker of the House of Representatives of the Province. In 1816 the then State of New Hampshire, through its legislature, sought to take over the college by substituting a new Board appointed by the Governor of New Hampshire. Under the original charter, the Board had been self-perpetuating. In the ensuing law suit the State prevailed. However the Supreme Court reversed. The Supreme Court found, in the first instance, that the State of New Hampshire had succeeded to the legal position of the King and that therefore Dartmouth stood as a private corporation, incorporated by the State of New Hampshire. Its founder, Reverend Elezar Wheelock, had agreed to this original charter and the arrangement of the members of the Board. The subsequent Board did not include state officers as *ex officio* members.

Faced with the "contract clause" of the United States Constitution the State argued that Dartmouth was a State institution because of its incorporation by the State and a "public" college because it was dedicated to education. The Supreme Court rejected both these arguments and held that the State could not alter the original contract or grant. The existence of the State officials on the Board did not make this a State school, nor did the act of incorporation. As to the argument that the corporation's educational purpose made it public, the court said at 634:

"Whence, then, can be derived the idea, that Dartmouth College has become a public institution, and its trustees public officers, exercising powers conferred by the public for public objects? Not from the source whence its funds are drawn; for its foundation is purely private and eleemosynary—not from the application of those funds; for money may be given for education, and the persons receiving it do not, by being employed in the education of youth, become members of the civil government."

Thus, without going further, it may safely be concluded that Tulane University is not a public school either through its state incorporation or its purpose to educate. The private source of its funds and its intent to educate to this extent make it private.

But there is more. The Administrators of the Tulane Educational Fund are related to the State of Louisiana by Act 43 of 1884. That Act must be analysed.

The stated purpose of Act 43 was to "foster, maintain and develop the University of Louisiana." It was in the form of an irrevocable contract between the State of Louisiana and the Administrators of the Tulane Educational Fund whereby the property, powers, privileges, franchises and immunities of the Administrators of the University of Louisiana were to be turned over to the control, management and use of the Administrators of the Tulane Educational Fund. The statute by its terms contemplated the creation of a new University through constitutional amendment. It

19. In subsequent years, as seen later on, the State unilaterally altered a portion of the duties owed to it by the private corporation, and on one occasion clarified one element of the contract. The evidence indicates that these variations were by the consent of the parties, at least tacitly.

provided for operation of the University during the period from passage of the statute to the next general election at which the amendment would be presented. The Louisiana Supreme Court confirmed this intent and the interim operation. Tulane Education Fund's Administrators v. Board of Assessors, 38 La. Ann. 292. The dedication of the Tulane Board's property to the University of Louisiana in the interim was to effectuate the legislative grant of a tax exemption for all of the Tulane Board's property even though that property standing alone did not have constitutional tax exemption. State ex rel. Board of Administrators Tulane Ed. Fund v. Board of Assessors, 35 La.Ann. 668. The new Board would have seventeen self-perpetuating members and the Governor of the State, the State Superintendent of Education and the Mayor of New Orleans would be ex officio members. The Administrators of the Tulane Educational Fund were to exercise these privileges, powers and immunities to develop and maintain the University of Louisiana and, if they failed to do so, all powers and immunities were to revert to the State, along with all the property of the University of Louisiana transferred by this Act. The revenues of the Tulane Educational Fund were to be dedicated not to purposes of private or corporate income or profit, but to the public purpose of developing and maintaining the University of Louisiana.[20] The revenues were to be tax-exempt. The tax exemption was to be confirmed by constitutional amendment at the next general election. The University was to be operated according to the terms of Paul Tulane's donation. Moreover, the property transferred could not be sold by the Board without legislative approval.

The Administrators were to waive all claims for appropriations from the State, apparently to void the provisions for appropriations in the Constitution of 1879.

In addition the Administrators would have to award a scholarship by appointment from every member of the General Assembly.[21] The name of the University was to be changed to the Tulane University of Louisiana.

The Act provided that its terms would be submitted as a constitutional amendment to the electorate of Louisiana and that the Board might operate under the Act in the interim with the right to revoke the contract in the event the amendments were defeated. Lastly the Act repealed certain provisions of the governing acts of the Revised Statutes of 1870.

On May 9, 1888, the Constitution of 1879 was amended by Article 269:

## TULANE UNIVERSITY AMENDMENT

"The terms of act No. 43, of the regular session of 1884, adopted at the session of the Legislature in the year 1884, are hereby ratified and approved; and all provisions of the Constitution of 1879 repugnant thereto or in any way impairing the passage thereof, are hereby repealed, so far as the operations of said act are concerned."

In 1890 by Act 94, permission was given to the Administrators by the legislature in accordance with Act 43 of 1884, to sell, lease or dispose of the property transferred by the State to the Administrators, so long as the transfer was approved by the Governor. At that time the funds from such sale or lease had to be reinvested in real estate. By Act 76 § 1 of 1942 the proceeds of such sales or leases could be reinvested in securities suitable for investment by trust funds. By Act 308 of 1944 the legislature required that the scholarships given to the members of the legislature by Act 43 of 1884 had to be awarded without regard to the sex of the recipient.

It must be concluded that the Administrators of the Tulane Educational Fund

20. The Supreme Court upheld this as a constitutional exemption in State ex rel. Administrators v. Board of Assessors, 38 La. Ann. 292.

21. Scholarships are also extended to the City of New Orleans in return for tax-free status.

are and have been affected by the following acts of the State of Louisiana through its legislature and constitution: the Constitution of 1879 (as amended by Constitutional Amendment Art. 269 of 1888); Act 43 of 1884 as adopted by the Constitutions of 1888, 1898, 1913 and 1921; Act 94 of 1890 as amended by Act 76 of 1942; and Act 308 of 1944.

The financial involvement of the State of Louisiana with the Tulane University of Louisiana is on two levels: (1) the property transferred, and its income, (2) the tax exemption. The Tulane University Financial Report 1959–1960 fixes the value of the University of Louisiana Fund at $213,269.90. Its inventoried value in 1884 was $152,436.48. The original site of the University of Louisiana in downtown New Orleans on which the Shell Building presently stands is a portion of that property. Its present appraised value is $3,500,000.00. The Mechanics Institute, also a portion of the property transferred by the State, was sold in 1903 for $65,000.00. At the time it had to be reinvested in real estate. By subsequent legislative act it could be invested in securities. In any event, it is presumed that it has been dedicated to the purposes of Act 43 of 1884. A portion of the old downtown campus was sold to the City of New Orleans in 1939 for $50,000.00. The same presumption applies to this fund as to the Mechanics Institute Fund. The Glendy Burke Fund of $1000.00 and the Louis Bush Medal of $1089.00 were also transferred to the Administrators. The income from the state property comes from interest and the rental value of the so-called Shell Building property. The rental value of $160,000.00 yearly is to be stepped up in 1965. The University Comptroller testified that the $65,000.00 received for the Mechanics Institute in 1903 could reasonably have yielded and apparently will continue to yield approximately 3.8%. The Common Street property fund has yielded, according to the Comptroller, approximately $2000.00 per year since 1939 and presumably will continue to do so. The tax exemption is valued by defendants at $196,128.50 per year.

It oversimplifies this case to the point of obscuring it to ask whether Tulane University is a "public" or "private" school. Quite clearly this suit does not seek a declaration that Tulane University of Louisiana and Louisiana State University are cut from the same cloth. The question is fundamentally a federal constitutional one, i. e. must the body which operates the Tulane University of Louisiana respond to the constitutional demands of equality of treatment to the citizens of this State, nothing more and nothing less.

■ This case has not been made more easy by the conceptualistic arguments advanced by the parties. Plaintiffs argue that a state university was transferred to the Tulane Educational Fund, that no new university was created, and that a distinction must be drawn between Tulane University and the Tulane Board. Defendants take the position that the state university styled the University of Louisiana ceased to exist in 1884; that a new private university came into being, namely Tulane University of Louisiana; that the Board of Administrators of the Tulane Educational Fund are operating a private university created in 1884 or 1888 subject to state action which if it exists at all is *de minimus*.[22] Simple as these arguments appear when stated, they founder when applied to the demonstrable and obvious facts. "How simple would be the tasks of constitutional adjudication and of law generally if specific problems could be solved by inspection of the labels pasted on them." Trop v. Dulles, 356 U.S. 86, 94, 78 S.Ct. 590, 594, 2 L.Ed.2d 596. Central to the problem of coming to grips with the parties' arguments is their concept that a "university" is a *res* of some sort which can be transferred,

22. It is, of course, perfectly consistent to accept defendants' position that Tulane University is a "private" school and also accept plaintiffs' position that state action is involved in the operation of the University.

created and destroyed. Whether this might have some philosophical basis or even some legal basis is another context,[23] and admitting that common usage and the literary history of Tulane University give some support to the idea of a university as a res, the concept breaks down when a court is compelled to decide a case under the Fourteenth Amendment. The most that need be said to state the question in this case is that a "university" is an *activity* rather than a *thing* in the legal sense.[24] The facts as developed later in this opinion will indicate that a wholly private organization, the Administrators of the Tulane Educational Fund, engage in an activity of academic instruction and pursuit, principally in a complex of buildings on St. Charles Avenue in the City of New Orleans, and that this activity grows out of a contract made with the State of Louisiana in 1884. The question for decision is whether this wholly private activity is so interrelated with the State of Louisiana that in performing this activity the Administrators must obey the commands of the Fourteenth Amendment. The law is clear that purely private organizations performing purely private activities may freely associate themselves with a State in such a way as to make that private organization, in its private activity, subject to the Four-

23. The corporate entity of the University of Louisiana has been referred to by the Louisiana Supreme Court on other occasions. Succession of Hutchinson, 112 La. 656, 36 So. 639. In dealing with the transaction as between the parties, the Louisiana Supreme Court has restricted itself to the precisely legal problems peculiar to state law. See Board of Administrators of the Tulane Educational Fund v. Board of Assessors, 38 La.Ann. 292; State ex rel. Board of Administrators Tulane Educational Fund v. Board of Assessors, 35 La.Ann. 668. The question before this court is, of course, one on which state interpretations can have no effect. Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984. And for this reason any problems presented by this case are best solved by looking to the practical realities rather than solely to the niceties of property concepts which are wholly foreign to the rights urged by these plaintiffs. See Hampton v. City of Jacksonville, 5 Cir., 304 F.2d 320, cert. den. sub nom. Ghioto v. Hampton, 83 S.Ct. 256; Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734. This in no way aims to ignore the law of the state which created the Board of Administrators, but rather leaves to the State courts those specific problems within its peculiar competence to solve. Here, the attempt to take a carefully devised legal plan to effectuate a private donation through agreement with the state by transfer of control and tax exemption, and make that the sole basis for pressing constitutional rights within the confines of jurisprudence which never gave a thought to the instant problem is to risk injustice to both parties through application of state law which is not precisely within the competence of this court. This case must not be solved under Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, but under Burton v. Wilmington Parking Authority, supra, Hampton v. City of Jacksonville, 5 Cir., 304 F.2d 320, and similar cases. "Moreover, a federal question is involved which the federal courts must decide for themselves so that a final and uniform interpretation may be given to the Constitution, the supreme law of the land; and in the performance of this duty in the pending case, we should not be governed merely by technical rules of law, but should appraise the facts in order to determine whether the (Administrators of the Tulane Educational Fund) may be classified as 'representatives of the state to such an extent that the great restraints of the Constitution set limits to their action.'" Kerr v. Enoch Pratt Free Library of Baltimore City, 4 Cir., 149 F.2d 212.

24. This court is confirmed in this view by the fact that courts, in dealing with state action in private affairs, have consistently looked to the character of the activity as it relates to the State rather than the instrumentality through which the activity is carried on. Thus in Burton, it mattered not that the Eagle Co. was operating a restaurant on state property rather than a bowling alley. In Hampton, the court did not examine the nature of golf courses but rather the prior state operation which was continued under a private guise. In Boman v. Birmingham Transit Co., 5 Cir., 280 F.2d 531, it was the relationship of a private company to a municipality through franchise which concerned the court, not the legal intricacies of how the private company got into the street car business.

683

teenth Amendment, whether that activity be that of a restaurant, Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45; a golf course, Hampton v. City of Jacksonville, 5 Cir., 304 F.2d 320; a library, Kerr v. Enoch Pratt Free Library, 4 Cir., 149 F.2d 212, or in this case a university. With few isolated exceptions, (Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L. Ed. 1152; Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265), activities are in themselves neither public nor private. What gives them their constitutional character is their source of power and control. This may be solely private, see Hampton v. City of Jacksonville, 5 Cir., supra, at 322, of 304 F.2d; Tonkins v. City of Greensboro, 4 Cir., 276 F.2d 890, or solely state, Brown v. Board of Education, supra, or both private and state, Burton v. Wilmington Parking Authority, supra. It is, of course, significant that education, as an activity, when engaged in by a private institution has long been held to be fundamentally private. Dartmouth College v. Woodward, supra.

Turning now to the case at bar, reduced to its simplest terms, the question is whether there is state action in the activities of the Tulane Board due to (1) the membership of state officers on the Board, (2) the state property transferred to the Board, (3) the tax exemption granted all the Board's property, and (4) the reversionary clause in Act 43. The Supreme Court demands that each case stand solely on its facts and forbears to make generalizations. Burton v. Wilmington Parking Authority, supra. The cases on state action suggest principles not rules. Yet this court knows that "only such action as may *fairly* be said to be that of the State," Shelley v. Kraemer, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 is under the aegis of the Fourteenth Amendment. (Emphasis added) The State in some of its manifestations must be involved to a significant extent with the private activity, Burton v. Wilmington Parking Authority, supra, Cooper v.

Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed. 2d 5. Can it be said that the State manifestations extant here are so significant that this court can *fairly* hold that the Tulane Board's actions are the actions of the State of Louisiana?

(1) Were the Tulane Board made up solely of state officers, without doubt there would be state action. Commonwealth of Pennsylvania v. Board of Directors of City Trusts of the City of Philadelphia, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (the Girard College Case). While the Supreme Court does not explain precisely why the choice of city officers to administer a private trust was state action, the substitution of private individuals as trustees eliminated the state action. In re Girard College Trusteeship, 391 Pa. 434, 138 A.2d 844, cert. den. Commonwealth of Pennsylvania v. Board of Directors of City Trusts of Philadelphia, 357 U.S. 570, 78 S.Ct. 1383, 2 L.Ed.2d 1546. Here there is no Orphans' Court which can remove the state officers from the Tulane Board because they are statutory members. However they are only three among seventeen private individuals and the evidence shows they have made an appearance at only two meetings in the history of the Board and show no disposition whatever to affect the policy of the Board. Even if the suggestion in the Burton and Hampton cases is correct that the state, in this sort of arrangement, must insist on nondiscriminatory clauses in the contract, there is no proper application here. That the Fourteenth Amendment did not apply to private discrimination was the law in 1884, Civil Rights Cases, supra, and there existed in 1884 the probable legislative belief that even the state could require separation of the races, and this belief was confirmed in 1896 by Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256. Even though the State knows better now, it is powerless to change the contract, Dartmouth College v. Woodward, supra, and its officers on the Tulane Board do not have the voting strength to affect, alter or change University policy, and they disavow any desire to do so.

If a principle can be distilled from the Girard College case it is that there is state action when state officials are the sole trustee of private funds. The court is unable to make that principle fit the make-up of the Tulane Board. This court cannot *fairly* say that the Tulane Board's action is the action of the State of Louisiana because a small minority of its members are state officers who do not attend the meetings and disavow any purpose to influence the Board.

(2) If the flow of state funds to private individuals is state action per se, then in these times the principle of the Civil Rights Cases recently approved and reaffirmed by the Supreme Court in Burton v. Wilmington Parking Authority and Shelley v. Kraemer, supra, is non-existent. But the recent reaffirmation of that principle convinces this court that much more than state funds in private hands is necessary for state action. The Supreme Court in Burton noted that the small percentage of state funds in the hands of the Eagle Restaurant did not inevitably negate state action because other factors were involved. Given the "persuasiveness" of the small amount of state money involved toward a finding of purely private action, presumably Burton would have presented another case had the state funds stood alone as "state action." Admittedly, when the state is by far the major contributor to the private enterprise, there is state action per se, Kerr v. Enoch Pratt Free Library of Baltimore, 4 Cir., 149 F.2d 212. Here the net advantage to the Tulane Board from the tax exemption reduced by the value of the scholarships the Board gives to the City of New Orleans and the State, is .82% of the cost of operations. The total advantage of the rental of the Shell Building over a ten year period, plus the net advantage obtained from the tax exemption is 2.02% of the operational cost of the University. The rental income plus the yearly tax exemption's value equal 20% of the endowment income. The book value of the Tulane Board's property is $30,597,057.00. Its market value is estimated at $49,088,416.-00. The present value of the property held by the Tulane Board which bears any relationship to the state is approximately $3,811,450.00 including the appraised value of the Shell Building property, the accrued interest on the previously sold property and the value of the Mechanics Institute and the portion of the property on Common Street sold to the City of New Orleans. This is approximately 12.6% of the book value and 7.7% of the estimated market price of the Tulane Board's property. These figures are all below the amounts in Burton which the Supreme Court admitted were persuasive against a finding of state action. They bear no sensible relation whatever to the percentages involved in the Kerr case. Standing alone these figures do not indicate state action. This court cannot *fairly* say that the Tulane Board is acting for the state because it has this much money from the state. The practice of governmental financial grants to private institutions in sizeable amounts, of which this court takes judicial notice, militates against a *fair* finding of state action on this ground alone.

(3) The tax exemption presents a state action question of greater complexity. The tax exemption extends to the property of the Tulane Board and its income. It must be noted at the outset that the exemption itself is not unique in the sense that there is none other like it. Such state exemptions as to all private institutional property (including income producing property) have been granted, and upheld, by the United States Supreme Court against subsequent state impairment, to an orphanage in St. Louis, Home of the Friendless v. Rouse, 75 U.S. (8 Wall.) 430, 19 L.Ed. 495; Washington University in St. Louis, The Washington University v. Rouse, 75 U.S. (8 Wall.) 439, 19 L.Ed. 498; Northwestern University in Chicago, University v. People, 99 U.S. (9 Otto) 309, 25 L.Ed. 387; and an orphanage in New Orleans, Asylum v. City of New Orleans, 105 U.S. (15 Otto) 362, 26 L.Ed. 1128. Also the Federal govern-

ment exempts from income tax the revenue from such property as that held by the Tulane Board. 26 U.S.C.A. § 501(c)(3). Even were the contrary true, it is very doubtful whether "unique" in the sense of "common" has any constitutional significance. The fact that state leasing arrangements are fairly common had no bearing whatever on the decision in Burton nor did the fact that private street car franchises are very common have any bearing in Boman v. Birmingham Transit, supra.

Plaintiffs urge that this tax exemption is unique in that it was acquired in return for dedication of property to the furtherance of an activity formerly engaged in by the state. Act 43 so provides and the Louisiana Supreme Court confirmed the validity of the tax exemption on that premise. Defendants submit that by the constitutional amendment of 1888 a "new" university came into being. As aforementioned there is very little significance in the concept of "old" and "new" university insofar as the constitutional question is concerned. The significance of the constitutional amendment of 1888 is that it grants the tax exemption on a different basis than Act 43, and therefore places the tax exemption outside the principle of Hampton v. City Jacksonville. As mentioned before, this court is unable to find legal support for the proposition that a simple grant of state funds to a private institution, be it in the form of a tax exemption or otherwise, is state action per se. The grant of tax immunity to an orphanage by state constitutional amendment because of the desire to foster charitable purposes is considerably different than a tax exemption granted as payment for adopting a state activity as was done by Act 43 of 1884. Therefore, had the original premise of tax exemption, approved by the Louisiana Supreme Court, continued to the present, this case would be close to Hampton. There, the compulsion to continue a former state activity, namely a golf course, was enforced by a reverter

clause in the act of sale. That situation of "compulsion by tax exemption" obtained under Act 43 until 1888. However, once the 1888 constitutional amendment had granted a tax exemption without the legal fiction of "public purpose" as a basis for the tax exemption, the situation became like the tax exemption to the orphanage as discussed above. To this extent, the Louisiana Supreme Court's opinion is relevant. In Tulane Education Fund's Administrators v. Board of Assessors, 38 La.Ann. 292 the Court noted that the exemption could have been granted by constitutional amendment and would eventually so be granted in 1888. However, the legislature had attempted to grant the exemption in the period from 1884 to 1888 by making the Tulane Board's property "public property" under Art. 210 of the Louisiana Constitution. The "dedication" of the Tulane Board's property to the "public purpose" of fostering the University of Louisiana created that result. However, the constitutional amendment of 1888 eliminated that basis and put it solely on the "simple tax immunity" basis which this court finds is insufficient for state action. This court, without specific higher authority, is unable to hold that a simple tax benefit evokes state action. Were that the law then every citizen of the United States and every legal creature would be within the proscription of the Fourteenth Amendment. There is not a scintilla of legal precedent in that direction.

(4) The reversion vested in the state over its property and franchises is the final state connection with the Tulane Board. The first observation is that the loss to the Tulane Board would be small in comparison to its total worth. If, as has been shown, the size of the state's property held by the Board does not have constitutional significance, then the importance of the reversion of that property to the state is reduced to the same extent. The corporate charter of the Tulane Board [25] gives it the power to op-

25. See letter of Paul Tulane incorporated in Charter, Administrators of the Tulane Educational Fund.

erate a university. Having incorporated the institution of the Administrators of the Tulane Educational Fund with this purpose the State of Louisiana need give it no further legal power to operate a university. Hence, the reversion of the franchise and powers transferred would in no way affect the operation of the university. It might be enough to say that since its effect is small or inconsequential the reversion is unimportant in the constitutional sense. However, the Hampton case involved a reversion and it must be dealt with.

The Hampton case, at the least, states the principle that a state may not, by legal device, give a private character to a state operation in order to effectuate racial discrimination. This appears to be the limited scope of the concurrence in the majority opinions. There is not, nor have plaintiffs suggested there was, any basis for finding that Act 43 was a device for maintaining segregation. To this extent Hampton does not control this case.

The other majority opinion appears to hold that the *effect* of the legal vehicle which provided the transfer from state to private hands must be examined to see whether the result is that the state activity is simply continued under private control. The point is well illustrated by the fact that golf courses are involved— an activity which is not so close to an expected activity of the state such as maintaining roads. The City of Jacksonville did nothing more than run a golf course for its citizens for a while and then shift control to a private party while requiring that the golf courses were still available for the public. The reversion in Act 43 states that if ever the Tulane Board ceases to use the state powers and property for the purposes of Act 43 then the state shall have the right to resume the custody and control of the property and powers formerly vested in the University of Louisiana. Those purposes were stated in the Preamble to be the fostering of the University of Louisiana and the vesting of the Tulane Board, upon the adoption of the constitutional amendment, the power to create, develop, and maintain a great university in the City of New Orleans. To the extent that the reversion requires the fostering of the University of Louisiana this case and the principle in Hampton are indistinguishable. To the extent that the Tulane Board has created and is developing a "great University in the City of New Orleans" that endeavor is purely private, Dartmouth College v. Woodward, supra, and the necessity of furthering a former state activity found in Hampton is lacking here.

At this juncture this court is faced with the fact that "[d]ifferences in circumstances beget appropriate differences in law." Whitney v. State Tax Comm'n, 309 U.S. 530, 542, 60 S.Ct. 635, 640, 84 L.Ed. 909; Burton v. Wilmington Parking Authority, supra at 726, of 365 U.S. at 862 of 81 S.Ct. This court cannot ignore the fact that over the eighty years since 1884 the creation of a great University in New Orleans has come to far outweigh the fostering of the University of Louisiana. It cannot ignore the particular circumstances of the Hampton case which compelled the court to more fully analyse the actions of the City of Jacksonville. In 1890 and 1944 the legislature amended the contract, with the acquiescence of the Tulane Board, to allow the Board to sell or lease the property transferred with the approval of the Governor. The revenue or proceeds were to be applied "exclusively for *University* purposes." (Emphasis added) Never again has the State referred to the maintenance of the University of Louisiana as it progressively loosened its grip on the property transferred. And, of course, there is the final and undisputable consideration that this reverter refers only to a small portion of the Tulane Board's property rather than, as in Hampton, the totality of the property in the hands of the private individual. The aforementioned factors compel this court to a finding that the facts in the case at bar are so far different from the facts in Hampton that the likeness in principle is dissolved by the differences in

circumstances. This court concludes that the Hampton case does not control this case and that the reversionary clause of Act 43 does not create state action.

In summary, it is the conclusion of this court that the state action or involvement in the affairs of the Tulane Board is not so significant that it may fairly be said that the actions of the Tulane Board are the actions of the State of Louisiana. To this extent the plaintiffs are not entitled to relief and this court so finds.

 The Tulane Board maintains that it would admit Negroes and put an end to racial discrimination if "it were legally permissible to do so." [26] To the extent that this restraint is due to Act 43, the Act is unconstitutional for a state may not compel racial discrimination in private affairs. Dorsey v. State Athletic Commission, 359 U.S. 533, 79 S.Ct. 1137, 3 L.Ed.2d 1028 affirming E.D.La., 168 F. Supp. 149; Boman v. Birmingham Transit Co., supra, and this court now so declares. The racial restriction is further imposed by the Act of Incorporation of the Tulane Board through the act of donation of Paul Tulane.

 In answer to the Third Party Petition the heirs of Paul Tulane expressly waive any right they may have had to enforce the racial restriction and indicate they have no opposition to the admission of Negroes to Tulane University. Indubitably the Tulane Board is free to act as it wishes since neither this nor any other court may exercise its power to enforce racial restrictions in private covenants. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161; Barrows v. Jackson, 346 U.S. 249, 73 S. Ct. 1031, 97 L.Ed. 1586.

It is unnecessary to pass on the matter of the Motion to Quash by Joseph M. Jones which is now moot. For the reasons stated in Footnote 5 the Motion to Abstain is denied.

IT IS ORDERED that Defendants' Motion to Abstain be, and the same is hereby, Denied.

IT IS ORDERED that the Motion of Joseph M. Jones to Quash service on him be, and the same is hereby, Denied.

## JUDGMENT

IT IS ORDERED, ADJUDGED AND DECLARED that:

(a) The Administrators of the Tulane Educational Fund is a private eleemosonary corporation engaged in higher education.

(b) The Tulane University of Louisiana is a private activity of the Administrators of the Tulane Educational Fund.

(c) There is insufficient state involvement in the operation of the Tulane University of Louisiana to bring it within the privileges and proscriptions of the Fourteenth Amendment to the United States Constitution.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that judgment be entered in favor of defendants and against plaintiffs.